Mark F. James (5295)
Mitchell A. Stephens (11775)
HATCH, JAMES & DODGE, P.C.
10 West Broadway, Suite 400
Salt Lake City, Utah  84101
Telephone:  (801) 363-6363
Email:  mjames@hjdlaw.com
        mstephens@hjdlaw.com

*Attorneys for Plaintiff Xyngular Corporation*

---

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XYNGULAR CORPORATION,<br><br>  Plaintiff,<br><br>v.<br><br>MARC SCHENKEL,<br><br>  Defendant.<br><br>---<br>[and Related Counterclaims and Cross claims] | **XYNGULAR'S MOTION TO DISMISS DERIVATIVE CLAIMS AND SUPPORTING MEMORANDUM**<br><br>Civil No. 2:12-cv-00876-RJS<br><br>Judge Robert J. Shelby |

## MOTION TO DISMISS

The Board of Directors of Plaintiff Xyngular Corporation (the "Board") hereby moves the Court to dismiss Marc Schenkel's ("Schenkel") Eleventh through Sixteenth Causes of Action (Schenkel's derivative claims).  Those claims fail as a matter of Delaware law.

A single disgruntled shareholder cannot override the business judgment and will of a company's board of directors.  Thus, once a shareholder has presented a demand to a company's

board of directors, under Delaware law (Xyngular is a Delaware LLC) a court will not substitute its judgment for the judgment of the board, even if the board rejected the demand and determined not to file suit.  "[O]nce a demand has been made, absent a wrongful refusal, ***the stockholder's ability to initiate a derivative suit is terminated.***"  *Charal Inv. Co., Inc. v. Rockefeller*, 1995 WL 684869 at *2 (Del. Ch. 1995) (internal quotation marks omitted).  This rule protects a board's right to manage the company's affairs, and courts routinely dismiss derivative claims filed after a board has investigated claims and exercised its judgment not to pursue them

Before asserting his derivative claims, Schenkel sent a written demand to Xyngular's board of directors.  Xyngular's Board then carefully considered the complaints Schenkel raised and determined it was not in Xyngular's best interest to pursue litigation related to those complaints.  Under Delaware law, that ends the inquiry with respect to the Schenkel's derivative claims.  Strategic decisions about Xyngular's operations should be made by its authorized and appointed board of directors, not from a lectern in a Utah courtroom.  Schenkel's allegedly derivative claims must be dismissed as a matter of law.

<u>**MEMORNADUM IN SUPPORT OF MOTION TO DISMISS**</u>

<u>**INTRODUCTION**</u>

On September 1, 2011, Schenkel's attorneys sent a demand letter (the "Demand Letter") to Xyngular and its Board.  A copy of the letter is filed herewith as Exhibit "A."[1]  In the letter, Schenkel demanded that Xyngular "investigate and pursue claims" against Revak, Kole and Julich, as officers and members of Xyngular's Board, and against officers and directors of "Symmetry Corporation/GVMS," including, but not limited to, Bruce Jensen ("Jensen").  The

---

[1] The Demand Letters also is attached as Exhibit E to Schenkel's Counterclaim and Third Party Complaint (Dkt. 5).

Demand Letter warned that if the Board "refuse[d] to pursue these claims, Mr. Schenkel will proceed with the appropriate derivative claims." [*See* Ex. "A"]. Xyngular's Board of Directors delegated review of Schenkel's Demand Letter to three newly-appointed directors – Dan Murphy, Jim Northrop and Russell Fletcher (the "Board"). These men were asked to review, investigate, and respond to Schenkel's Demand Letter.

Xyngular's Board spent several months reviewing and investigating each of Schenkel's allegations of wrongful conduct. As part of these efforts, Xyngular's Board negotiated a new agreement between Xyngular and GVMS (a subject about which Schenkel had complained) regarding the management and IT services GVMS provides to Xyngular. At the close of the Board's investigation, it was determined there was no basis for Schenkel's claims and that it was not in Xyngular's best interest to pursue the claims. Schenkel was advised of this determination verbally and was again informed in writing on October 8, 2012 (the "Demand Response Letter"). A copy of the Demand Response Letter is filed herewith as Exhibit "B."[2]

Despite the fact that Xyngular and the Board had considered and refused Schenkel's derivative demand, Schenkel continued to complain and threaten Xyngular. Recognizing that Schenkel's threats and claims could harm the ability of Xyngular to successfully grow the company, Xyngular filed this declaratory judgment action. In response, Schenkel answered and asserted 21 counterclaims and third-party claims, including various derivative claims (Counts 11-16) allegedly asserted on behalf of Xyngular and against the Third Party Defendants. Schenkel's derivative claims are virtually identical to the rejected claims contained in his Demand Letter.

---

[2] The Demand Response also was attached as Exhibit P to Schenkel's Counterclaim and Third Party Complaint (Dkt. 5).

Delaware law is clear that "directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984). "The decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation." *Spiegel v. Buntrock*, 571 A.2d 767, 772-73 (Del. 1990). Importantly, the board is allowed – indeed required – to consider more than the merits of the underlying claims at issue when considering a litigation demand. The board must also evaluate the economic and non-economic costs of litigation, including the impact litigation and its related publicity will have on the company's goodwill, employee morale, pending or potential deals and transactions, and any other business concerns. It is precisely for this reason that the board's review of a litigation demand is subject to the ***business judgment*** standard, rather than a ***de novo/question of law*** standard. The board's decision not to pursue litigation is a question of business prowess that cannot be examined through the prism of litigation appraisement. *See, e.g.*, *Abbey v. Control Data Corp.*, 603 F.2d 727 (8th Cir. 1979) ("Such a determination, like any other business decision, must be made by the corporate directors in the exercise of their sound business judgment"); *Spiegel*, 571 A.2d 767, 775-76 (Del. 1990) ("[S]tockholders who . . . make a demand which is refused, subject the board's decision to judicial review according to the traditional business judgment rule.")

If the board of directors, acting "on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest," determines it is in the company's best interest not to pursue litigation, that decision is final. *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988). Stated differently, in order to have standing to assert a derivative claim, a shareholder must establish that the board acted in bad faith when it determined that pursuing

iv

alleged claims was not in the company's best interest.  In order to protect the business from strike-suits and other improper filings, the determination of whether a shareholder can meet this standard is made **solely** from the well-pleaded allegations of the complaint; discovery is not available to save (or delay) dismissal of a deficient claim.  *See, e.g.*, *Allison v. General Motors Corp.*, 604 F. Supp. 1106, 1121-22 (D. Del. 1985) ("[T]he Court simply assesses the allegations of the complaint to determine if plaintiff alleges legally sufficient reasons to call into question the validity of the Board of Directors' exercise of business judgment."); *Szeto v. Schiffer*, 1993 WL 513229 at *4 (Del. Ch. 1993) ("[T]he Court accepts the well-pled allegations in the complaint as being true, and then applies the business judgment rule to determine whether the board's rejection of the presuit demand is protected from further judicial scrutiny.").

In this case, Schenkel's derivative claims must be dismissed.  Schenkel presented Xyngular's Board with a demand.  Xyngular then properly considered and rejected Schenkel's derivate claims.  Schenkel cannot now properly use this lawsuit as a means to judicially second-guess the Board's business judgment. The Court should not replace the judgment and leadership of Xyngular's Board with the self-serving bombast of a single disgruntled shareholder.

### STATEMENT OF FACTS

1. Xyngular Corporation ("Xyngular") is incorporated in the State of Delaware. [(Dkt. 5) Answer, Counterclaim and Third Party Complaint ("Counterclaims") at ¶3].

2. Counterclaimant Schenkel is a shareholder of Xyngular.  [*Id*. at 2].

3. On September 1, 2011, Schenkel sent the Demand Letter to Xyngular's Board demanding that Xyngular investigate and pursue claims against members of Xyngular's Board and against other companies (*i.e.*, Symmetry and GVMS).  [*See id*. at ¶ 59; Exhibit "A"].

4.     In response to the Demand Letter, Xyngular's Board delegated review of Schenkel's demand to three members of Xyngular's Board of Directors – Dan Murphy, Jim Northrop and Russell Fletcher.  [*See* Ex. "B"].  These directors were asked to investigate Schenkel's claims.  They were tasked with determining whether or not it was in Xyngular's best interest to pursue the claims raised in Schenkel's Demand Letter.  [*Id.*].

5.     After investigation, the Board determined that the litigation suggested by Schenkel's demand was not in Xyngular's best interests.  Schenkel was then verbally informed of this determination.  [*Id.* ("[W]e have had a number of conversations about your allegations . . . .")].  On October 8, 2012, the Board also sent the Demand Response Letter to Schenkel.  The Demand Response Letter outlined the Board's conclusions after having conducted its investigation and analysis of the claims alleged in Schenkel's Demand Letter.  [*See id.*].

6.     The Demand Response Letter addressed each of Schenkel's complaints, noted the actions the Board members had taken to investigate Schenkel's claims, and requested that Schenkel "let us know if you have any further questions."  [*Id.*].

7.     Schenkel ignored the determinations made by Xyngular's Board and, on October 22, 2012, filed derivative claims allegedly on Xyngular's behalf in this case.  [*See* Counterclaims at ¶ 60].

**ARGUMENT**

**I.      DELAWARE LAW APPLIES TO SCHENKEL'S DERIVATIVE CLAIMS.**

Delaware law governs this Motion.  The Supreme Court has determined that the law of the state of incorporation applies to derivative actions filed in federal court.  *See Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 97 (1991).   Federal courts repeatedly have recognized that "[i]t is not disputed that the law of a corporation's state of incorporation, is the law to be applied to determine whether the noninterested members of its board of directors have the authority to terminate a lawsuit by invoking the business judgment rule."  *Abramowitz v. Posner*, 513 F. Supp. 120, 126 (S.D.N.Y. 1981) *aff'd*, 672 F.2d 1025 (2d Cir. 1982) (citing *Burks v. Lasker*, 441 U.S. 471, 478 (1979) & *Abbey v. Control Data Corp.*, 603 F.2d 724, 728-29 (8th Cir. 1979)); *see also Cadle v. Hicks*, 272 Fed. Appx. 676, 678 (10th Cir. 2008) (recognizing "the law of the state of incorporation" controls and applying Delaware law).

Delaware law unambiguously declares that "once a demand has been made, absent a wrongful refusal, *the stockholder's ability to initiate a derivative suit is terminated.*"  *Charal Inv. Co., Inc.*, 1995 WL 684869 at *2 (internal quotation marks omitted) (emphasis added).  That is the case here.

**II.     SCHENKEL MADE A DEMAND TO XYNGULAR'S BOARD OF DIRECTORS.**

Delaware Code section 141 unambiguously declares that "[t]he business and affairs of a corporation . . . shall be managed by or under the direction of a board of directors."  Del. Code Ann. tit. 8 § 141(a).   "The decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation."  *Spiegel v. Buntrock*, 571 A.2d 767, 772-73 (Del. 1990).   "Thus, 'by its very nature [a] derivative action

1

impinges on the managerial freedom of directors.'"  *Stone v. Ritter*, 911 A.2d 362, 366 (Del. 2006) (citation omitted).  Accordingly, under Delaware law, a stockholder does not have the right to bring a derivative action until he either has made a demand on the corporation to institute such an action and that demand has been wrongly refused, or he has demonstrated that the making of such a demand would have been futile.  *See, e.g., id.* at p. 366-67 (declaring derivative action plaintiff must establish that directors "wrongfully refused" demand or that demand is excused because directors "are incapable of making an impartial decision"); *White v. Panic*, 783 A.2d 543, 550 (Del. 2001) (same).

In this case, there is no dispute that Schenkel made a demand on the Xyngular Board, or that the Board investigated and rejected that demand.  [*See* Counterclaims at ¶ 59 ("Mr. Schenkel made a pre-suit demand on Xyngular's then existing board members . . . ."); Ex. "A" (Schenkel's 9/1/2011 Demand Letter); Ex. "B" (the Demand Response Letter)].  Thus, the issue the Court must decide is whether Schenkel's derivative claims can proceed given that his demand was made and refused.  *See generally Charal Inv. Co.,* 1995 WL 684869 at *2 ("[O]nce a demand has been made, absent a wrongful refusal, the stockholder's ability to initiate a derivative suit is terminated.").

## III.   BECAUSE SCHENKEL MADE A PRE-SUIT DEMAND, HE CONCEDED THE BOARD'S INDEPENDENCE, LACK OF SELF-INTEREST, AND ITS ABILITY TO MAKE AN INDEPENDENT DECISION.

When a shareholder elects to make a demand on the board (rather than attempt to show that the demand was excused as futile), the effect "is to place control of the derivative litigation in the hands of the board of directors."  *Spiegel*, 571 A.2d at 775.  Indeed, on this point Delaware law could hardly be clearer:  "[T]he making of a pre-suit demand concedes that demand is

required" and that concession applies "to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Grimes,* 673 A.2d at 1219–20 (alteration in original) (internal quotation marks omitted). "A shareholder who makes a demand can no longer argue that demand is excused." *Spiegel*, 571 A.2d at 775-76.

This principle was clearly demonstrated in the case of *FLI Deep Marine LLC v. McKim*, 2009 WL 1204363 (Del. Ch. Apr. 21, 2009). In *FLI,* the plaintiffs were "minority shareholders" who "were convinced from the outset that the company's board was under the dominion and control of the majority shareholders and had assisted the majority shareholders in looting the company." *Id.* at *1. "Nevertheless, instead of presenting their derivative claims on behalf of the company first to this Court and pleading demand excusal, they inexplicably decided to make a demand upon the board of directors." *Id.* "Following demand, the allegedly conflicted directors promptly formed a committee charged with the investigation of the alleged wrongdoing." *Id.* The plaintiffs then filed suit, "claiming that demand on the board was excused." *Id.* Indeed, the plaintiffs alleged that the committee was "comprised of [two] . . . board members, both of whom the [p]laintiffs accuse of wrongdoing, and of a disabling lack of independence by virtue of their" relationship with another defendant. *Id.*

The company in *FLI* moved to dismiss the derivative claims, arguing that by submitting a demand to the company's board the plaintiffs had admitted – as a matter of law – that demand was not futile. The court agreed. *Id.* at *3-4. Indeed, the court found "[o]n this point Delaware law could hardly be clearer." *Id.* at *3. "[W]here a shareholder . . . chooses to make a demand upon a board of directors, she concedes the independence of a majority of the board." *Id.* ("[Plaintiffs] have conclusively conceded the independence of the Board, and are precluded from

now arguing that demand should be excused because the directors are conflicted.").  The court ruled that it could "not part ways with established Delaware law to grant the Plaintiffs relief from a strategic decision they now regret."  *Id.*  The court held that "[b]ecause the Plaintiffs chose to make a pre-suit demand on the Board, they are precluded from now arguing demand futility here" and that "where a shareholder's demand has been [presented and] refused, this Court ***only*** examines the good faith and reasonableness of the board's investigation."  *Id.* (emphasis added).

Schenkel's Counterclaim & Third Party Complaint repeatedly acknowledges that Schenkel made a demand on Xyngular's Board of Directors.  For example, in Paragraph 105, Schenkel declares that he "made a pre-suit demand on Xyngular's then existing board members." [Dkt. 5 at ¶ 105; *see also id.* at ¶ 59 ("Schenkel . . . sen[t] a demand letter to Xyngular" and attaching "Demand Letter"), ¶ 60 (addressing "demand letter"); ¶ 63 (same); ¶ 82 (same); ¶ 83 ("Xyngular's 'independent board members,' sent a response to Mr. Schenkel's . . . demand letter"); ¶ 86 (addressing "Schenkel's demand letter")].   "[W]here a shareholder's demand has been [presented and] refused, this Court ***only*** examines the good faith and reasonableness of the board's investigation." *FLI Deep Marine*, 2009 WL 1204363 at *3.    In other words, "***once a demand has been made, absent a wrongful refusal, the stockholder's ability to initiate a derivative suit is terminated***." *Spiegel,* 571 A.3d at 775 (emphasis added); *see also Aronson*, 473 A.2d at 813 (holding stockholder "lacks the legal managerial power to continue the derivative action, since that power is terminated by the [demand] refusal").

## IV.    THE BUSINESS JUDGMENT RULE PROTECTS THE BOARD'S DECISION TO REJECT SCHENKEL'S DEMAND.

The Board's decision not to pursue the derivative claims Schenkel raised in his Demand Letter is subject to the business judgment rule.  *See Spiegel*, 571 A.2d at 774 ("[W]here demand

on a board has been made and refused, [courts] apply the business judgment rule in reviewing the board's refusal to act pursuant to a shareholder's demand . . . .") (alteration in original) (internal quotation marks omitted)).   The business judgment rule creates a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812; *see also Heineman v. Datapoint Corp.*, 17 Del. J. Corp. L. 620, 631 (Del. Ch. 1991) ("Under the business judgment rule, the directors are presumed to have acted in an informed manner, in good faith and honest belief that their decision is for the good of the corporation.") (citing *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986)).

"Absent an abuse of discretion, if the requirements of the traditional business judgment rule are met, the board of directors' decision not to pursue the derivative claim will be respected by the courts."  *Spiegel*, 571 A.2d at 777.   "***In such cases, a board of directors' motion to dismiss an action filed by a shareholder, whose demand has been rejected, must be granted***." *Id.* (emphasis added). "'If Courts would not respect the directors' decision not to file suit, then demand would be an empty formality.'"   *Id.* at 777-78 (quoting *Starrels v. First Nat. Bank of Chicago,* 870 F.2d 1168, 1174 (7th Cir.1989)).[3]

---

[3] The Delaware Supreme Court has explained the business judgment rule applies even when the Board appoints a special committee to investigate a shareholder demand.  "The same standard of judicial review is applicable when a board delegates authority to respond to a demand to a special litigation committee.   The issues are solely the good faith and reasonableness of the committee's investigation."  *Spiegel v. Buntrock*, 571 A.2d 767, 778 (Del. 1990); *see also Seminaris v. Landa*, 662 A.2d 1350, 1353 (Del. Ch. 1995) ("[A] disinterested board of directors does not waive its right to control derivative litigation merely by delegating that control to a special committee.").  *See generally* Delaware Code Ann. Title 8 § 141(a) (authorizing board of directors to appoint a committee, which may then "exercise all the powers and authority of the board of directors in management of the business and affairs of the corporation").

"The burden is on the party challenging the decision [*i.e.*, Schenkel] to establish facts rebutting this presumption." *Spiegel*, 571 A.2d at 774 (citing *Aronson*, 473 A.2d at 812). Accordingly, after a demand is made by a stockholder, even if the board refuses the demand, the stockholder may proceed with the derivative suit only if he meets his burden of demonstrating that "the board's rejection of the demand was wrongful." *Mount Moriah Cemetery v. Moritz*, 1991 WL 50149, at *3 (Del. Ch. April 4, 1991).

To establish that the Board's decision was wrongful, Schenkel must show that the Board conducted an unreasonable investigation or acted in bad faith. *See Spiegel*, 571 A.2d at 777 ("[W]hen a board refuses a demand, the only issues to be examined are the good faith and reasonableness of its investigation."); *Charal Inv. Co.*, 1995 WL 684869 ("[O]nce the shareholder makes the demand on the board, thereby conceding that a majority of the board is independent, the Court's only inquiry is into the board's good faith and the reasonableness of the investigation."). Thus, "[t]he ultimate conclusion of the [litigation] committee ... is *not* subject to judicial review." *Id.* (emphasis in original).

In the context of a Motion to Dismiss where a shareholder demand has been made and refused, Delaware courts determine whether the plaintiff may proceed with pursuit of derivative claims based ***solely*** on the well-pleaded allegations of the complaint. Discovery is not permitted to save or delay dismissal of an improper derivative claim. *See, e.g.*, *Allison v. General Motors Corp.*, 604 F. Supp. 1106, 1121-22 (D. Del. 1985) ("[T]he Court simply assesses the allegations of the complaint to determine if plaintiff alleges legally sufficient reasons to call into question the validity of the Board of Directors' exercise of business judgment."); *Szeto v. Schiffer*, 1993 WL 513229 at *4 (Del. Ch. 1993) ("[T]he Court accepts the well-pled allegations in the

complaint as being true, and then applies the business judgment rule to determine whether the board's rejection of the presuit demand is protected from further judicial scrutiny.").

## V.   SCHENKEL HAS FAILED TO ESTABLISH THAT THE BOARD DID NOT ACT IN GOOD FAITH OR CONDUCT A REASONABLE INVESTIGATION.

Schenkel has failed to plead in his Counterclaim and Third Party Complaint particularized facts that establish Xyngular's board did not act in good faith or reasonably investigate Schenkel's Demand Letter.

### A.   *Schenkel Has Not Established that the Board Acted in Bad Faith.*

Schenkel's claim that the Board acted in bad faith rests on his assertion that the Board made knowingly false and misleading statements in rejecting Schenkel's pre-suit Demand.  [*See* Counterclaims at ¶ 84].   Specifically, Schenkel's counterclaims identify three statements contained in the Board's Demand Response Letter, which Schenkel claims are "false and misleading":

  (1) That "[t]here has been no transfer of Xyngular stock to members of GVMS" [Counterclaims at ¶ 84];

  (2) That GVMS "provide[s] most strategic management, operations, logistics, IT and other services…" [*id.* at ¶ 97]; and

  (3) That the fees Xyngular pays to GVMS have resulted in "economies of scale" that benefit "Xyngular by driving costs down" [*id.* at ¶ 100].

In fact, however, fair scrutiny of Schenkel's allegations reveals that the Board made no false statements nor acted in bad faith.  Thus, Schenkel's allegations of bad faith must be rejected.

In the first instance, even if, as Schenkel contends, these statements were false and misleading, that does not establish – as is required for Schenkel to assert a derivative claim – that Xyngular's Board acted in bad faith.  It is one thing for a board of directors to misstate a fact,

and another thing entirely to show that the board knowingly and willingly engaged in a bad-faith review of the claims alleged. *See In Re Citigroup, Inc. Shareholder Derivative Litigation*, 964 A.2d 106, 134 (Del. Ch. 2009) ("A determination of whether the alleged misleading statements or omissions were made with knowledge or in bad faith requires an analysis of the state of mind of the individual director defendants, and plaintiffs have not made specific factual allegations that would allow for such an inquiry."). Indeed, even if Schenkel's allegations establish that the Board was grossly negligent when it considered Schenkel's demand, that still would not establish that the Board ***intentionally*** acted in bad faith. *See, e.g.*, *McPadden,* 964 A.2d at 1263 (Del.Ch. 2008) ("[I]t is quite clearly established that gross negligence, alone, cannot constitute bad faith"). Rather, Schenkel must present particularized facts that would, if proven true, demonstrate that the Board "acted in bad faith through a ***conscious*** disregard for their duties." *Id*. at 1275 (emphasis added). Schenkel has not done so and cannot do so, and his derivate claims must be dismissed as a result.

In any event, even if absolute accuracy were the standard for evaluating whether the Board acted in good faith (and that is not the case), the derivative claims still would have to be dismissed. The three statements Schenkel relies on in attempting to show bad faith were neither false nor misleading.

### 1. Schenkel's Claim that the Board Falsely Stated that "[t]here has been no transfer of Xyngular stock to members of GVMS" is Groundless.

Schenkel's Demand letter asked the following: "We . . . question the transfer of certain stock in Xyngular ***to shareholders*** of GVMS without prior consideration." [Ex. "A" (emphasis added)]. The Board directly responded to this alleged concern by reaffirming that "[t]here has been no transfer of Xyngular stock to ***members*** of GVMS, other than what was issued to Revak,

Kole and Julich at the beginning of Xyngular's existence."  [*See* Ex. "B" (emphasis added)].  Put simply, the Board considered and properly answered Schenkel's Demand Letter.

Now, Schenkel has changed his target.  Specifically, in is Counterclaims, Schenkel alleges that the Board "advance[d] a straw-man argument" when it stated that no transfer of Xyngular stock has been made to "***members*** of GVMS."  [Counterclaims at ¶ 86 (emphasis added)].  Schenkel then incorrectly alleges that his Demand Letter "question[ed] the transfer of certain stock in Xyngular to ***employees*** of Symmetry."  [*Id.* at ¶ 86 (emphasis in original)].[4]  In fact, it is Schenkel who has presented the straw-man argument.  Schenkel's Demand Letter plainly did not question purported transfers of Xyngular stock to "employees of Symmetry."  Schenkel's Demand Letter asked about transfers "to ***shareholders*** of GVMS," and the Board specifically answered that question.  Xyngular's Board could not have acted in bad faith by truthfully answering the concern Schenkel actually raised in his Demand Letter.

Schenkel's sole allegation relating to Xyngular stock provided to a Symmetry ***shareholder*** is his assertion that the Board "secretly made . . . Symmetry shareholder William Gunther" a Xyngular shareholder . . . for less than full consideration."  [*Id*. at ¶ 87].  Again, however, Schenkel fails to establish any issue with the Board's response.  Indeed, far from being a "secret" transaction, Schenkel was informed of this very transaction in the Board's Demand Response Letter.  As Schenkel's own Counterclaim recognizes, Xyngular's Board informed Schenkel that Mr. Gunther was "[a] Stock Appreciation Rights holder[]."  *Id*. at ¶ 94.

---

[4] Schenkel goes on to cite several examples of facts that purport to establish that in early 2011, certain Symmetry employees were given Xyngular stock.  [*See* Counterclaims at ¶¶ 87-93, 132].  But again, these allegations are completely irrelevant because Schenkel's demand failed completely to question transfers of Xyngular stock to Symmetry employees.

Furthermore, as a matter of law, Stock Appreciation Rights are not stock.  *See e.g., Little v. Waters*, 1992 WL 25758 * 2 n.4 (Del.Ch.) (noting that stock appreciation rights "are different from common stock").[5]  Thus, given that Mr. Gunther held Stock Appreciation Rights – which the Board disclosed to Schenkel – the Board's response was completely accurate.  And, there certainly is no evidence the Board's response was not made in good faith.

> **2.  Schenkel's Claim that the Board Falsely Asserted that GVMS "provide[s] most strategic management, operations, logistics, IT and other services" Is Groundless.**

Schenkel also alleges that the Board made a knowingly false representation when it asserted in its Demand Response Letter that "GVMS was then providing and continues to provide most strategic management, operations, logistics, IT and other services." [Counterclaims at ¶ 97].  To support his claim, Schenkel alleges that despite billing Xyngular over $2 million, GVMS "has not delivered any new back office services," that there has been "no update or feature enhancement to Xyngular's back office in more than a year," and that "system changes would not even be available until mid 2013."  [*Id.* at ¶ 98].

Schenkel does not make any attempt to explain why the purported lack of  "new services" or "updates and feature enhancements" to Xyngular's back office demonstrates that the Board's statement that GVMS provides "most strategic management, operations, logistics, IT and other services" was knowingly false.  Indeed, Schenkel's claims only relate to the IT services GVMS

---

[5] The Board notes that Schenkel has already presented to this Court evidence that Gunther agreed to receive stock appreciation rights from Xyngular.  [*See, e.g.*, Ex. N (Dkt. 34-14) to Schenkel's Memorandum in Support of Motion for Temporary Restraining Order, Stock and SAR Proposal] and that Xyngular's May 1, 2012 "Earnings Distribution" schedule clearly shows that the only shareholders of Xyngular at that time (and since September 2011) were Revak, Julich, Kole, Swan and Schenkel.  [*See* Ex. M (Dkt. 34-13) to Schenkel's Memorandum in Support of Temporary Restraining Order, May 1, 2012 Earnings Distribution schedule].

provides, and even then he does not dispute that those services actually are provided to Xyngular by GVMS.  With respect to the non-IT services GVMS provides to Xyngular (strategic management, operations, logistics, etc.), Schenkel does not even attempt to offer any particularized facts in order to challenge the Board's statement.

Because Schenkel has not alleged particularized facts that would establish the Board *intentionally* acted in bad faith, Schenkel instead asks the Court to force Schenkel's judgment about what outside vendor can best serve Xyngular's "management, operations, logistics, IT and other" needs onto the company.  Instead of accepting that the Board carefully considered and determined this issue, Schenkel asks the Court to make him the sole decider as to what will prove "most strategic" for Xyngular's long-term business.  The Court should – and, pursuant to applicable Delaware law, must – reject Schenkel's request to second-guess what is a core question of business judgment.

   3.  **Schenkel's Claim that the Board Falsely Stated that "the fees Xyngular pays to GVMS have resulted in 'economies of scale' that benefits 'Xyngular by driving costs down'" Is Groundless.**

Finally, Schenkel claims the Board falsely represented in its Demand Response Letter that "the fees Xyngular pays to GVMS have resulted in 'economies of scale' that benefits 'Xyngular by driving costs down.'" [*See* Counterclaim at ¶ 100].  In fact, the Board actually stated that "we believe that proper execution of the plan to gain economies of scale through GVMS by having it provide services to multiple companies, benefits Xyngular by driving costs down." [*Id.* at ¶ 99].  The Board offered its opinion regarding what it "believed."  It also qualified its statement by noting that "proper execution of the plan to gain economies of scale" was a condition to the plan's success.  Schenkel's allegation attempts to turn the Board's

11

statement of its opinion and belief into an affirmative misrepresentation.  However, even if the Board's opinion were treated as a representation of fact, Schenkel has failed to plead particularized facts that establish the Board's statement was false or misleading (let alone knowingly false or misleading).  Again, what Schenkel really wants is for the Court to second-guess the business judgment exercised by Xyngular's Board when it evaluated and elected to continue with GVMS.  This the Court cannot properly do.

In an effort to support his claim, Schenkel points to (i) GVMS' 2011 internal budget and asserts that "roughly 50% of GVMS's entire budget is drawn from the exorbitant fees it charges Xyngular," and (ii) the fact that the amount of fees GVMS has charged Xyngular for its services has risen.  [*See* Counterclaim at ¶¶ 101 & 102].  Even if these allegations are accurate (they are not), they are immaterial.  The Board exercised its business judgment and determined – after considering GVMS' charges – that GVMS still was the most strategic partner for Xyngular.  That determination is not a question of law or fact that this Court properly may second-guess.  The Board's determination is a question of business strategy.  The Board explained its decision to Schenkel and further explained that GVMS also was implementing a plan that further would reduce Xyngular's costs, which was Schenkel's concern.   Even if the "economies of scale" Xyngular hopes for ultimately are not achieved, the Board acted well within its business judgment when it made the strategic decision not to cause Xyngular to implement a dramatic change to its management, operations, logistics, IT, and other related functions.

In sum, Schenkel has not shown that the Board acted in bad faith in rejecting Schenkel's pre-suit Demand.

**B.     Schenkel Has Not and Cannot Establish That the Board Failed to Conduct a Reasonable Investigation.**

In order to demonstrate that a board has not conducted a reasonable investigation, "the alleged deficiencies in the . . . investigation must rise to the level of **gross negligence**." *Mount Moriah Cemetery, v. Moritz*) 1991 WL 50149 at *4 (Del. Ch. 1991) (emphasis in original). Schenkel gives three purported reasons for concluding that the Board's investigation of his Demand Letter was unreasonable. Those allegations, even were they true, do not come close to demonstrating that the Board's actions were grossly negligent under Delaware law.

First, Schenkel claims that the Board ignored and failed to address his claim that "Xyngular's top selling product Xyng was misappropriated" by Revak, Julich and Kole and "is now being sold under Symmetry's label as 'Symply Magic.'" [Counterclaims at ¶ 103]. This allegation is untrue. More important here, there were no assertions relating to Xyng – none whatsoever – in the Demand Letter. [*See* Ex. "A"]. The reasonableness of Xyngular's investigation is not properly attacked based on an allegation that the Board failed to investigate something that was not even contained in Schenkel's Demand Letter.

Second, Schenkel alleges that the Board's assertion that it spent a significant amount of time investigating Schenkel's claims "appears to be false." [*See* Counterclaims at ¶ 104]. Schenkel provides a single allegation to support this claim – that Northrop purportedly admitted to Schenkel that he never contacted Oliver to investigate using a third-party vendor to provide IT services to Xyngular at a lower cost. [*See id.*] Even if the Board (as opposed to Mr. Northrop personally) did not contact Oliver as Schenkel alleges, "[t]his allegation falls short" of demonstrating bad faith or unreasonableness "because '[i]n any investigation, the choice of people to interview or documents to review is one on which reasonable minds may differ.'" *Gatz*

13

*v. Ponsoldt*, 2004 WL 3029868 *5 (Del. Ch. 2004) (quoting *Mt. Moriah Cemetery v. Moritz*, 1991 WL 50149 (Del. Ch. 1991)).

Third, Schenkel claims that because the Board sent its Demand Response Letter after Xyngular had filed its declaratory judgment action, "the responsive letter is simply a sham attempt to fulfill the 'response' requirement after the fact." [*See* Counterclaims at ¶ 104]. That assertion is nonsensical. The fact that Xyngular's board felt strongly enough that it not only rejected Schenkel's demand but went so far as to also affirmatively move for a judicial decree rejecting Schenkel's demand is evidence of the Board's careful consideration of Schenkel's complaint, not evidence that it brushed his concerns aside. In any event, Schenkel still has not and cannot establish well-pled facts that prove the Board's consideration of Schenkel's demands was anything less than thorough and appropriate. Furthermore, as the Demand Response Letter notes, Xyngular's Board "had a number of conversations about [Schenkel's] allegations of improper actions" with Schenkel before sending the Demand Response Letter. Schenkel was informed of the Board's decision both verbally and in writing before Schenkel filed the derivative claims. It is Schenkel's derivative claims that are the subject of this motion, and under Delaware law Schenkel lacks authority to assert derivative claims that the company has refused.

There are no factually-based allegations that the Board acted with gross negligence (indeed, in any way unreasonably) in conducting its review and investigation of Schenkel's pre-suit demand. Therefore, the Board's Motion seeking dismissal of Schenkel's purported derivative claims asserted on behalf of Xyngular must be dismissed.

## CONCLUSION

Schenkel has asked this Court to substitute its judgment (actually, Schenkel's judgment) for the business judgment exercised by Xyngular's Board.  That is not appropriate. The Court must decline Schenkel's demand that Xyngular's strategic business decisions be determined from inside a Utah courtroom.  Schenkel's derivative claims should be dismissed as a matter of Delaware law.

DATED this 7th day of May, 2013.

HATCH, JAMES & DODGE

/s/  *Mark F. James*
_____
Mark F. James
Mark H. Richards
Mitch A. Stephens

*Counsel for Plaintiff/Counterclaim Defendant*
*Xyngular Corporation*

15