# UNITED STATES DISTRICT COURT DISTRICT OF UTAH
# CENTRAL DIVISION

| | |
|---|---|
| XYNGULAR CORPORATION, | |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION** |
| MARC SCHENKEL, | **AND ORDER** |
| Defendant. | |

XYNGULAR CORPORATION,

      Plaintiff,

v.

MARC SCHENKEL,

      Defendant.

---

MARC SCHENKEL,

      Counterclaimant,

v.

XYNGULAR CORPORATION,

      Counterclaim Defendant.

---

MARC SCHENKEL,

      Third-Party Plaintiff,

v.

RUDY REVAK; MARY JULICH; STEVE
KOLE; MARC WALKER; BRUCE
JENSEN; DAN MURPHY; RUSSELL
FLETCHER; JIM NORTHROP; ROBERT
SPANGLER; SYMMETRY
CORPORATION; GLOBAL VENTURES
MANAGEMENT SERVICES, LLC;
ALYTIS, LLC; and GLOBAL VENTURES
PARTNERS;

      Third-Party Defendants.

**MEMORANDUM DECISION
AND ORDER**

Case No. 2:12-cv-876

Judge Robert J. Shelby

This case arises out of a dispute between a corporation and one of its shareholders over shares of stock. Plaintiff and Counterclaim Defendant Xyngular Corporation sued Defendant, Counterclaimant, and Third-Party Plaintiff Marc Schenkel for breach of contract. Schenkel then counterclaimed against Xyngular and brought third-party claims against several individuals and entities associated with Xyngular.[1] The case soon became mired in a quarrel over whether the parties engaged in sanctionable conduct. After engaging in lengthy discovery on the issue, the parties filed cross-motions for dispositive sanctions. For the reasons stated below, the court grants in part the Xyngular Parties' Motion for Dispositive Sanctions and denies without prejudice Schenkel's Motion for Dispositive Sanctions.

## BACKGROUND

To provide necessary context for the cross-motions for dispositive sanctions, the court details the events giving rise to this case as well as the procedural history that led to the current motions.

## I. The Formation of Xyngular Corporation

Marc Schenkel met Rudy Revak in summer 2009. The two became friends and had many discussions about their mutual interest in network marketing. Schenkel had been involved in the network marketing field for many years and at the time was a distributor for a multi-level marketing company called Xango. Revak was and is a founder and the majority owner of a multi-level marketing corporation called Symmetry.

Schenkel told Revak during their many discussions that he had learned of a new compensation concept that could revolutionize the network marketing arena. They agreed to form a new company that would use the concept. Revak offered for a fee to provide programming, product, and logistics support to the company through Symmetry. He also

_____
[1] The court refers to Xyngular and the Third-Party Defendants collectively as the "Xyngular Parties."

decided to include two of his Symmetry co-owners, Mary Julich and Steve Kole, in the venture to help manage the new company. The company they eventually created is Xyngular Corporation.

The four founders agreed that Revak and Symmetry would provide the necessary resources to launch Xyngular. They also used resources from Global Ventures Management Services (GVMS) to get the company off the ground. Revak, Julich, and Kole co-own GVMS, which began as a division of Symmetry in 2009 but later became a stand-alone entity in 2011. Like Symmetry, GVMS provides IT, consulting, and logistics services to Xyngular for a fee. GVMS also provides similar services to other entities, and it has since changed its name to Alytis.

In September 2009, Revak, Julich, and Kole incorporated Xyngular in Delaware. Xyngular's Certificate of Incorporation shows that Revak, Julich, and Kole were designated as Xyngular's Board of Directors.[2] Revak became Chairman of the Board, while Julich became Vice President and Kole became Secretary and Treasurer.[3]

Meanwhile, Schenkel declined to be Xyngular's President because he was working on a separate business that required his attention. He instead agreed to recruit a President and a Master Distributor for Xyngular. As promised, Schenkel recruited Marc Walker to serve as Xyngular's President and Joe Slovenec to serve as its Master Distributor. Xyngular promised Slovenec a 3% ownership interest in Xyngular that would vest over time. Xyngular also hired Glen Oliver as the company's Chief Operations Officer and Bart Graser as its Assistant Secretary and Treasurer.

---

[2] Certificate of Incorporation (Dkt. 35, Ex. A); *see also* Incorporator's Certificate (Dkt. 35, Ex. B) ("The following persons have been nominated and elected . . . as directors of Xyngular Corporation to hold office until the first annual meeting of shareholders and until their successors are elected and qualify: Steven Kole[,] Rudy Revak[, and] Mary Julich.").
[3] October 1, 2009 Board Meeting Minutes (Dkt. 35, Ex. C).

The founders—Revak, Schenkel, Julich, and Kole—then agreed to an ownership structure whereby Revak would become Xyngular's majority shareholder and the other three founders would become minority shareholders. They decided that Revak would receive a 51% ownership interest; that Schenkel, Julich, and Kole would each receive a 10% interest; that Walker would receive a 5% interest; and that Slovenec would receive a 2% interest. The founders also agreed that Ian Swan would receive a 2% ownership interest in the company. Swan is an IT consultant for GVMS who agreed to provide programming services to Xyngular and to create its infrastructure.

At its first meeting, held in October 2009, the Board of Directors issued Revak 5,100 shares, Julich 1,000 shares, Kole 1,000 shares, and Swan 200 shares. The Board did not issue Schenkel any shares at this meeting because his agreement with Xango prevented him from holding shares in Xyngular. But it was understood that Xyngular would issue Schenkel his 10% ownership interest once he was no longer obligated to Xango.

Later that month, Xyngular submitted to the Internal Revenue Service IRS Form 2553, titled "Election by a Small Business Corporation." Kole signed the Form on behalf of Xyngular on October 23, 2009. Like the share distribution the Board approved at the October 2009 meeting, the Form shows that Revak is entitled to 5,100 shares, that Julich is entitled to 1,000 shares, that Kole is entitled to 1,000 shares, and that Swan is entitled to 200 shares.

The Board voted in January 2010 to double the number of outstanding shares. The Board doubled each of the current shareholders' shares and issued Revak 10,200 shares, Julich and Kole each 2,000 shares, and Swan 400 shares. Again, the Board did not issue Schenkel any shares due to his agreement with Xango. But shortly after the January 2010 meeting, Xango

suspended Schenkel's distributorship upon learning of his role within Xyngular.[4]

Slovenec stepped down as Master Distributor in mid-2010. In doing so, he agreed to surrender his shares of Xyngular stock, including his 3% ownership interest—or 600 shares—that had yet to vest.

## II. Schenkel's Role in Xyngular

Although Schenkel was unwilling to be Xyngular's President, he was willing to use his relationships with major distributors from other leading multi-level marketing companies to help build the Xyngular distributor network. Believing that it could capitalize on those contacts, Xyngular gave Schenkel the top position on Xyngular's distribution genealogy in addition to his 10% ownership interest in the company.[5]

Schenkel also became Xyngular's Interim Sales Director around the time when Slovenec resigned as Master Distributor.[6] Xyngular paid Schenkel a monthly income while he served in that capacity, issued him a company credit card, and allowed him to attend exclusive company events. In turn, Schenkel held conference calls with distributors, traveled around the country to meet with distributors, and promoted Xyngular at meetings with distributors.[7] The parties understood that Schenkel would temporarily hold the position until Xyngular hired a permanent Sales Director, which it did in about August 2011.

The parties dispute the remaining details of Schenkel's role within Xyngular. The Xyngular Parties submit evidence that Schenkel assumed the responsibilities of Master Distributor in addition to his responsibilities as Interim Sales Director. Xyngular's corporate representative testifies that Revak asked Schenkel to step in as the company's Master Distributor

---

[4] Xango Suspension Letter (Dkt. 35, Ex. D).
[5] *See* Decl. of Marc Schenkel (Dkt. 24, Ex. A), ¶¶ 12–13; *see also* Fall 2009 Meeting Notes (Dkt. 24, Ex. E) (stating "10% plus top position – Marc S").
[6] Decl. of Marc Schenkel (Dkt. 24, Ex. A), ¶ 19.
[7] *See* Xyngular Rule 30(b)(6) Depo. (Dkt. 289, Ex. 1), at 127–29.

when Slovenec resigned.[8]  Revak also declares that Schenkel orally agreed in early December

2010 to perform the duties of Master Distributor in exchange for additional compensation.[9]

Under the agreement, Schenkel would continue as the Interim Sales Director until Xyngular

hired a permanent Sales Director.[10]  He would also receive an additional, irrevocable 3%

ownership interest if Xyngular's IPC sales reached $2 million per month while Schenkel

performed as Master Distributor.[11]  And he would receive an additional 7% if Xyngular's IPC

sales reached $5 million per month while he performed as Master Distributor.[12]  Revak agreed to

personally pay Schenkel the 7% of profits in the event sales hit the $5 million mark, and

Schenkel agreed to pay the taxes on that amount.[13]

As evidence of the agreement, the Xyngular Parties point to Revak's handwritten notes

from the December 2010 meeting.  The notes state, "Give M.S. additional 3% ownership @ 2

mil and additional 7% @ 5 mil from Rudys dist.  But M.S. to pay taxes."[14]  Julich declares that

she later recorded the terms of the December 2010 agreement in a document titled "Xyngular

Corporate Equity Agreement."[15]  The document states:

> Rudy Revak agrees to personally pay Marc Schenkel the equivalent of 7% of
> the total shareholder distribution paid from Xyngular Corporation.
>
> Should the company be sold the equivalent of 7% of the net sale amount will
> be paid to Marc Schenkel by Mr. Rudy Revak.
>
> Marc Schenkel agrees to pay any and all taxes due on this income.
>
> This agreement will take effect any quarter that Xyngular Corporation

---

[8] *See* Xyngular Rule 30(b)(6) Depo. (Dkt. 308, Ex. 4), at 124:2–125:2.
[9] Decl. of Rudy Revak (Dkt. 72, Ex. 2), ¶¶ 3–5; *see also* Decl. of Mary Julich (Dkt. 35), ¶¶ 56–57; Xyngular Rule 30(b)(6) Depo. (Dkt. 308, Ex. 4), at 124:8–125:3.
[10] Decl. of Mary Julich (Dkt. 35), ¶ 57.
[11] Decl. of Rudy Revak (Dkt. 72, Ex. 2), ¶ 4.  The IPC sales are Xyngular's benchmark of product sales that Xyngular uses to judge the company's growth.
[12] *Id.*
[13] *Id.*
[14] Dec. 4, 2010 Notes (Dkt. 35, Ex. F).
[15] Decl. of Mary Julich (Dkt. 35), ¶ 61.

averages a minimum of 5 million dollars in IPC sales per month. And [at] 2 mill[ion] per month IPC sales M.S. to receive 3% from Rudy Revak.[16]

Revak and Schenkel signed the agreement on March 30, 2011.[17]

As Master Distributor, Schenkel was required to recruit distributors and leadership.[18] Although Schenkel recruited some people, the Xyngular Parties offer evidence that Schenkel failed to adequately perform these duties.[19] For instance, Julich declares that by September 2011 Schenkel had substantially stopped participating in conference calls with and recruiting sales leaders, stopped traveling to conduct distributor meetings and trainings, and stopped training distributors generally.[20] Julich also declares that Schenkel "had made unapproved and very expensive purchases at company events and thrown lavish parties that put the company at risk and negatively affected its image."[21] Walker likewise testifies that Schenkel made several unauthorized expenditures on the company's credit card and threw parties that could reflect poorly on Xyngular.[22]

Meanwhile, Kole issued Schenkel his stock certificate in early 2011, but backdated the effective date of the shares to January 1, 2010.[23] Revak and Kole signed the certificate.[24] It shows that Xyngular issued Schenkel 2,600 shares.[25] The Xyngular Parties contend that Kole erroneously issued Schenkel 2,600 shares—representing a 13% interest—instead of the allegedly agreed upon 2,000 shares—representing a 10% interest with the possibility of earning another

[16] Corporate Equity Agreement (Dkt. 35, Ex. G).
[17] *See id.*
[18] Decl. of Mary Julich (Dkt. 35), ¶ 67.
[19] *Id.*
[20] *Id.* ¶¶ 78–79.
[21] *Id.* ¶ 77.
[22] *See* Xyngular Rule 30(b)(6) Depo. (Dkt. 308, Ex. 4), at 182:12–188:9.
[23] Decl. of Mary Julich (Dkt. 35), ¶ 69; *see also* Decl. of Rudy Revak (Dkt. 72, Ex. 2), ¶ 7; Decl. of Steve Kole (Dkt. 72, Ex. 3), ¶ 3; Offer to Purchase Shares (Dkt. 322, Ex. 10).
[24] Stock Certificate (Dkt. 24, Ex. O).
[25] *Id.*

3% interest.[26]  The Xyngular Parties insist that the 2,600 shares figure was an error because Schenkel had not earned the additional 3%.[27]  Indeed, Xyngular did not hit its goal of $2 million IPC sales in one month until April 2012, after Schenkel allegedly quit performing as Master Distributor.  And so, the Xyngular Parties maintain that Schenkel never became entitled to the additional 3% interest or 600 shares.

The Xyngular Parties also claim that Schenkel never sat on Xyngular's Board of Directors.  Though he may have attended some meetings, "Schenkel never attended any Board meetings as a member of the Board."[28]  Julich declares that the shareholders did not elect Schenkel to sit on the Board.[29]  To be sure, Kole sent Schenkel a letter in August 2011 inviting him to become a Board member.[30]  And Schenkel even signed the letter later that month.[31]  But after Schenkel threatened litigation against the other founders, as explained below, the Board decided not to vote to add Schenkel to the Board.[32]  "As a consequence, Schenkel has never served on Xyngular's Board or been one of its Directors."[33]

Schenkel offers contrary evidence showing that he never agreed to become Master Distributor, that he nevertheless became entitled to 2,600 shares of Xyngular stock, and that he received a lifetime seat on Xyngular's Board of Directors.  Schenkel submits deposition testimony of Xyngular's corporate representative that Schenkel and Xyngular did not finalize an agreement that would have made him Xyngular's Master Distributor,[34] and that he worked hard

---

[26] Decl. of Mary Julich (Dkt. 35), ¶ 70.
[27] *See, e.g.*, Nov. 30, 2012 Letter from Steve Kole to Marc Schenkel (Dkt. 24, Ex. BB) (stating, "I mistakenly issued 600 shares to you the receipt of which was conditioned on you fulfilling your role as Master Distributor").
[28] Decl. of Mary Julich (Dkt. 35), ¶ 27.
[29] *Id.* ¶ 26.
[30] Aug. 2, 2011 Letter (Dkt. 35, Ex. I).
[31] Aug. 23, 2011 Email (Dkt. 35, Ex. J).
[32] Decl. of Mary Julich (Dkt. 35), ¶ 102.
[33] *Id.* ¶ 26.
[34] *See* Xyngular Rule 30(b)(6) Depo. (Dkt. 289, Ex. 1), at 100:19–25, 159:6–9, 162:6–23, 164:18–20.

while serving as Interim Sales Director.[35] Schenkel also states in his sworn declaration that, while he served as the Interim Sales Director, he worked overtime, flew nearly 10,000 miles, and held meetings and events to recruit more distributors.[36] He also "flew all over the country attending various public events and was featured in numerous Xyngular promotional videos that were distributed by the Company worldwide. [He] was routinely recognized as Xyngular's Founder and the face of the Company."[37] And for his efforts and success in that role, Xyngular rewarded him the "3 percent stock ownership, or 600 shares, which had once been reserved for Joe Slovenec."[38] "[T]he transfer of these 600 shares was not a mistake or . . . conditioned upon [his] continued performance as interim Sales Director."[39]

Schenkel also declares that Xyngular never hired another Master Distributor after Slovenec left the company, because Xyngular eliminated the position when Schenkel became the Interim Sales Director.[40] And "[p]rior to Xyngular's formation, Mr. Revak promised [Schenkel] that [he] would have a permanent seat on Xyngular's Board as one of the founding shareholders. From the time Xyngular was launched in December 2009 until the Other Founders excluded [him] in September 2011, [he] attended Xyngular board meetings as a board member."[41]

Schenkel points to his stock certificate as evidence supporting his claim that he is entitled to 2,600 shares. He also submits an email that Graser, Xyngular's Controller at the time, sent to Schenkel's accountant in November 2011.[42] Graser states in the email that Schenkel owns "13%

---

[35] *See id.* at 127:4–129:5.
[36] Decl. of Marc Schenkel (Dkt. 24, Ex. A), ¶ 20.
[37] Second Decl. of Marc Schenkel (Dkt. 39), ¶ 9.
[38] Decl. of Marc Schenkel (Dkt. 24, Ex. A), ¶ 22.
[39] Second Decl. of Marc Schenkel (Dkt. 39), ¶ 6.
[40] *Id.* ¶ 7.
[41] *Id.* ¶ 3; *see also* March 17, 2010 Email from Vikki Doran to Marc Schenkel (Dkt. 24, Ex. U) ("Hello Marc, Can you please let me know if I am making your flight and hotel arrangements for the board meeting in Utah?").
[42] Nov. 3, 2011 Email from Bart Graser to Mike Colagiovanni (Dkt. 24, Ex. P).

of authorized shares."[43]  Similarly, an email sent from Kole to Schenkel in March 2011 shows that 2,600 shares had vested in Schenkel's name.[44]

Schenkel further contends that the 600 shares he received for his efforts as Interim Sales Director is separate from the agreement memorialized in the Corporate Equity Agreement. While Revak's agreement to pay Schenkel the equivalent of 3% or 7% from his personal funds was conditioned upon Xyngular reaching certain sales goals, Schenkel's receipt of 600 shares was unconditional.

Finally, Schenkel offers an email that Kole sent to him in late April 2011.  The email includes an attachment titled "Letter of Understanding."[45]  In the body of the email, Kole states:

> Attached is a Letter of Understanding.  I don't believe the word "Contract" or "Agreement" is the right word because since you got involved we have operated on the basis that you would become a shareholder and provide various services which you would be compensated for [as] the company progressed.  This letter identifies all the various things that have been discussed with Rudy, Mary, and myself, what our understanding is, and what the intent of the company is.  As such it's just [] "an understanding" and therefore the legal wording should not distract from what the intents of the parties are.[46]

Kole sent the Letter "to acknowledge and identify specific facts surrounding the acquisition of Marc Schenkel's common shares of stock in Xyngular Corporation as well as other duties and responsibilities undertaken."[47]  The Letter states, "Marc was offered 10% of the company as one of the original shareholders which equals 2,000 shares as of January 1st, 2011."[48] And "[a]s an original shareholder he was also promised a seat on the Board of Directors."[49]  The company also provided Schenkel "a distributor position in the marketing plan immediately below

---

[43] *Id.*
[44] Mar. 17, 2011 Email from Steve Kole to Marc Schenkel (Dkt. 24, Ex. Q).
[45] Letter of Understanding (Dkt. 24, Ex. F).
[46] *Id.* at 2.
[47] *Id.* at 3.
[48] *Id.* at 4.
[49] *Id.*

the company with the understanding that he will continue to recruit sales leaders from the direct selling industry and be a 'goodwill ambassador' for the company."[50]  But "per Marc's request this position will not be known to the sales field."[51]

The Letter then explains that, after Slovenec left his post as Master Distributor, Revak "requested that Marc Schenkel assume that role and become active in the company for a period of time until a Sales Manager could be hired by the company."[52]  Schenkel's role, "although no longer called a Master Distributor," required him to (1) "[p]articipate in conference calls with the sales leaders and other distributors of the company"; (2) "[t]ravel to various cities and conduct distributor meetings"; (3) "[p]rovide training to distributors on how to improve recruiting and leadership development"; (4) "[d]iscuss with management concepts for sales promotions, contest criteria, and new product development"; and (5) "act [as] a liaison between the sales field and the company on current events and various day to day operational issues."[53]  In exchange for the performance of those duties, Schenkel was to receive, among other things, "[a]n option to acquire the 600 shares of stock initially assigned to the Master Distributor responsibilities."[54]

With respect to Schenkel's alleged Board of Directors seat, the Letter states that it is the Board's intention "to treat Marc Schenkel in the same manner as the other three founding shareholders who are Rudy Revak, Mary Julich, and Steve Kole."[55]  And "[t]he current Board shall consist of Marc Schenkel, Steve Kole, and Mary Julich, and Rudy Revak."[56]  "The position

---

[50] *Id.*
[51] *Id.* at 5.
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.* at 5–6.
[56] *Id.* at 6.

for Marc Schenkel shall be [] permanent for as long as he is living and maintains his stock interest providing he is of sound mind and body."[57]

At the end of the Letter, there is a line for Schenkel's signature and another line for Kole's.[58] Both are unsigned.

## III.   Deterioration of the Relationship

Schenkel began to suspect in mid-2010 that Revak, Julich, and Kole were self-dealing, usurping corporate opportunities, and overall looting the company.

For example, Schenkel alleges that the other founders improperly gave bonuses to GVMS managers, including themselves, in February 2011.[59]   Schenkel also contends that the services Symmetry provided to Xyngular were abysmal.   Yet the other founders unilaterally decided in April 2011—without a vote of disinterested board members—to increase the amount of fees Xyngular paid to Symmetry for its services.[60]   This allegedly occurred again when the other founders decided to increase the fees Xyngular paid to GVMS for its services.[61]   While this was happening, the other founders supposedly allowed Bruce Jensen, GVMS's Vice President, to take control of Xyngular's management.[62]   Schenkel claims that as part of his takeover, Jensen caused Xyngular to pay GVMS another $2.5 million for its substandard service.[63]

Schenkel also maintains that the other founders secretly gave Xyngular stock to five Symmetry executives and shareholders for less than full consideration.[64]   And when he asked the other founders about it, they concealed the true nature of those transactions.   For instance, Schenkel points to an email that Kole sent him in June 2011, in which Kole disclosed only three

---

[57] *Id.*
[58] *Id.* at 7.
[59] *See* Third Amended Answer, Counterclaim, and Third-Party Complaint (Dkt. 282), ¶¶ 43–48.
[60] *Id.* ¶¶ 52–53.
[61] *Id.* ¶ 55.
[62] *Id.* ¶ 58.
[63] *Id.* ¶ 59.
[64] *Id.* ¶¶ 101–02.

of the five Symmetry executives and shareholders that were given Xyngular stock.

Schenkel further claims that Revak, Julich, and Kole misappropriated Xyngular's premier product—an appetite suppressing, energy boosting tablet called Xyng—in October 2011 by putting another label on it and selling it through Symmetry as Symply Magic.[65]

## IV.    Schenkel's Collection of Documents From Swan

Schenkel approached Swan at some point between mid-2010 and mid-2011 to see if he could confirm Schenkel's suspicions that the other founders were engaging in illegal and otherwise unethical conduct.[66]  Schenkel also inquired if Swan had "any information pertaining to [Schenkel's] situation and [his] shares at Xyngular."[67]  Schenkel testifies that he asked Swan "if there was any information he could provide that would prove my point of how many shares I owned,"[68] and if there "was anything that could support my claims when I found out that they were in my opinion looting the company."[69]  Schenkel further "asked for any documentation that could substantiate not only my deal, but the fact that I wasn't participating in any of these alleged acts."[70]

In response, Swan told Schenkel about numerous illegal activities in which the other founders allegedly engaged.[71]  For example, Swan told Schenkel that the other founders were making payments to themselves, other executives, and other individuals from offshore accounts

---

[65] Decl. of Marc Schenkel (Dkt. 24, Ex. A), ¶ 32.

[66] *See* TRO Hearing Tr. (Dkt. 139), at 85:22–86:1, 86:16–17, 90:2–5; Decl. of Marc Schenkel (Dkt. 307, Ex. 10), ¶ 5 ("In early to mid 2011, I asked Mr. Swan if the Other Founders were cheating the government in taxes, or were otherwise breaking the law.").

[67] TRO Hearing Tr. (Dkt. 139), at 85:20–21.

[68] *Id.* at 86:6–7.

[69] *Id.* at 86:14–15.

[70] *Id.* at 90:17–20; *see also* Marc Schenkel Depo. (Dkt. 290, Ex. 3), at 141:15–142:23 (explaining that he asked Swan "if there was any documentation or information" concerning Schenkel's shares in Xyngular and potential illegal activity that might implicate him).

[71] *See* Disc. Resp. Re. Sanctions (Jensen) (Dkt. 290, Ex. 6), at 3; Decl. of Marc Schenkel (Dkt. 307, Ex. 10), ¶ 6; Decl. of Ian Swan (Dkt. 40), ¶ 35 ("Mr. Schenkel was made aware of the illegal conduct during a conversation we had.").

to avoid taxes.[72]  Swan also shared his concern that Symmetry was selling products containing lead.[73]  And he told Schenkel that Symmetry had engaged in a tax fraud scheme in which Symmetry collected over $2 million in sales tax from distributors nationwide and then failed to register or remit the sales tax to the proper authorities.[74]

Swan learned about Symmetry's alleged tax fraud before he met Schenkel and while he was working in Symmetry's IT department.[75]  After he unsuccessfully tried to correct the issue internally, Swan began identifying and collecting documents from the local area network on an ongoing basis to chronicle the other founders' illegal conduct.[76]  Swan also collected documents for his own purposes, such as to confirm his ownership in Xyngular.[77]

Schenkel discussed these and other issues with Swan for over a year.[78]  On several occasion, Swan showed Schenkel documents on his laptop that he had collected over time.[79]  According to Schenkel, the documents evidenced the other founders' illegal conduct as well as confirmed his ownership in Xyngular.[80]  It is unknown exactly what documents Schenkel viewed on Swan's laptop.

In October 2011, Schenkel began collecting copies of documents from Swan "pursuant to [his] request to review the books and records of Xyngular."[81]  As Schenkel put it, he asked Swan "for any information or documentation regarding not only, I believe, my shares, but the fact that

[72] Decl. of Marc Schenkel (Dkt. 307, Ex. 10), ¶ 6.
[73] See Marc Schenkel Depo. (Dkt. 307, Ex. 2), at 92:4–94:21.
[74] Id.; see also Decl. of Ian Swan (Dkt. 40), ¶ 36 ("I informed Mr. Schenkel . . . that I believed that Symmetry was involved in a tax avoidance scheme.").
[75] See Ian Swan Depo. (Dkt. 307, Ex. 6), at 197:15–200:20; Decl. of Ian Swan (Dkt. 40), ¶ 34 ("While working for Symmetry, I became aware of acts of misconduct that were being perpetrated by Mr. Revak, Mr. Kole, and others that I believed constituted illegal conduct.").
[76] See Ian Swan Depo. (Dkt. 307, Ex. 6), at 127:9–128:7, 141:13–143:1.
[77] See id. at 142:8–143:20.
[78] Decl. of Marc Schenkel (Dkt. 307, Ex. 10), ¶ 8.
[79] Id.; see also Marc Schenkel Depo. (Dkt. 290, Ex. 3), at 143:6–12 ("Well, the first time – I don't know when the first time was, but I do know that occasionally Mr. Swan would show me documents on his computer that he had collected for his own purposes.").
[80] Decl. of Marc Schenkel (Dkt. 307, Ex. 10), ¶ 8.
[81] Second Decl. of Marc Schenkel (Dkt. 39), ¶ 20.

I wasn't participating in any of the alleged illegal acts."[82]  Swan then proceeded to give Schenkel over three hundred documents on at least five "zip sticks."[83]  For example, Swan gave Schenkel earnings distribution charts, Board meeting minutes, and "contracts that [Revak] had signed showing his percent interest."[84]  Swan also gave Schenkel balance sheets, budgets, financial projections, employment agreements, and documents containing settlement communications in a separate lawsuit, product ingredient information, and employees' personal information.

The documents Schenkel obtained belong not only to Xyngular, but also to GVMS, Symmetry, and other companies that house their documents on GVMS's servers.  Aside from owning shares in Xyngular, Schenkel has never been an owner, officer, director, employee, or shareholder of any of these other companies.  And though Swan—as an IT consultant for GVMS—had authorization and the necessary password to access the GVMS servers on which these documents and business records reside, there is no evidence that he had authorization to remove the documents, possess them, or give them to third parties.[85]  Nor is there any evidence that Schenkel himself had authorization or a password to access GVMS's servers.  To the contrary, he testified that he had neither a password nor access to GVMS's local area network.[86]

Schenkel collected documents from Swan "over a long period of time, perhaps over maybe a year."[87]  But Swan testifies that he did not give Schenkel any documents after this

---

[82] Marc Schenkel Depo. (Dkt. 290, Ex. 3), at 147:4–8; *see also* Decl. of Marc Schenkel (Dkt. 307, Ex. 10), ¶ 9 ("Only after Mr. Swan volunteered information regarding my interest in Xyngular, did I ask Mr. Swan if there was other information confirming my claims to ownership."); TRO Hearing Tr. (Dkt. 139), at 87:4–5 ("I asked for any information that he could provide to me, if he would do that.").

[83] *See* TRO Hearing Tr. (Dkt. 139), at 87:14–89:1 ("There is a various amount of documents. . . .  Let's see.  There were a lot."); Marc Schenkel Depo. (Dkt. 290, Ex. 3), at 148:4–19; Summary of Documents (Dkt. 290, Ex. 57), at 1–28.  Schenkel testified at his deposition that he still has the zip sticks.  Marc Schenkel Depo. (Dkt. 290, Ex. 3), at 150:3–4.

[84] TRO Hearing Tr. (Dkt. 139), at 87:11–15.

[85] *See* Ian Swan Depo. (Dkt. 290, Ex. 4), at 68:16–69:17 (testifying that he could not access the local area network to find the documents he provided to Schenkel without a password because the network was password protected).

[86] *See* Marc Schenkel Depo. (Dkt. 290, Ex. 3), at 254:25–255:25.

[87] TRO Hearing Tr. (Dkt. 139), at 89:12–13.

litigation began in September 2012.[88]

Around the time he began collecting documents from Swan, Schenkel contacted the FBI to report the other founders' allegedly illegal conduct.[89]  He testifies that he contacted the FBI at least four times, and that he gave the FBI hard copies of the documents on the zip sticks.[90]  Schenkel's last visit with the FBI was on or about February 3, 2012.[91]  He acknowledges, however, that he received more documents from Swan after that last visit, and that he did not give those documents to the FBI.[92]

Schenkel also contacted the IRS and the Santa Clara County Tax Assessor to report the alleged tax fraud scheme.[93]  Schenkel spoke with the IRS at least three times, but did not provide the IRS any documents.[94]  He similarly talked with the Santa Clara County Tax Assessor several times between 2011 and late 2012, but did not give him any documents.[95]

Schenkel never told Revak, Kole, or Julich that he received documents from Swan,[96] but he did tell Walker (Xyngular's President) and Oliver (Xyngular's COO).[97]  He also told Walker and Oliver that he had met with the FBI.[98]  But neither Schenkel nor Oliver could recall whether Schenkel disclosed which documents he had collected from Swan.[99]  And Walker testified that he never received any documents from Schenkel.[100]  The record before the court establishes that Schenkel's disclosure to Walker and Oliver was incomplete, vague, and nonspecific.

---

[88] Ian Swan Depo. (Dkt. 307, Ex. 6), at 47:16–22.
[89] Marc Schenkel Depo. (Dkt. 307, Ex. 2), at 145:9–16; Third Decl. of Marc Schenkel (Dkt. 307, Ex. 12), ¶ 4.
[90] Marc Schenkel Depo. (Dkt. 307, Ex. 2), at 148:12–152:8; Decl. of Marc Schenkel (Dkt. 307, Ex. 10), ¶ 19.
[91] Third Decl. of Marc Schenkel (Dkt. 307, Ex. 12), ¶ 5.
[92] Marc Schenkel Depo. (Dkt. 307, Ex. 2), at 200:24–201:5.
[93] Decl. of Marc Schenkel (Dkt. 307, Ex. 10), ¶¶ 17–19.
[94] Marc Schenkel Depo. (Dkt. 307, Ex. 2), at 179:14–181:14.
[95] Third Decl. of Marc Schenkel (Dkt. 307, Ex. 12), ¶ 7.
[96] TRO Hearing Tr. (Dkt. 139), at 92:3–11.
[97] Marc Schenkel Depo. (Dkt. 307, Ex. 2), at 188:13–24; Glen Oliver Depo. (Dkt. 307, Ex. 3), at 97:10–13.
[98] Marc Schenkel Depo. (Dkt. 307, Ex. 2), at 192:21–194:3; Glen Oliver Depo. (Dkt. 307, Ex. 3), at 31:16–21.
[99] Marc Schenkel Depo. (Dkt. 307, Ex. 2), at 191:24–192:4; Glen Oliver Depo. (Dkt. 307, Ex. 3), at 97:21–99:23.
[100] Decl. of Marc Walker (Dkt. 307, Ex. 13), ¶ 10.

In any event, Walker told Revak that Schenkel was receiving documents that apparently showed the other founders were engaging in misconduct.[101]  Walker also told Jensen that information was flowing from Swan to Schenkel.[102]  Jensen then shared this knowledge with Revak, Kole, and Julich.[103]

While he was reviewing and collecting documents from Swan, Schenkel made several of his concerns and complaints known to the other three founders.  The Xyngular Parties maintain that the other founders took his concerns seriously and held meetings with him and his attorneys to discuss a resolution.[104]  Schenkel, however, testifies that they retaliated against him in response by excluding him from regular Xyngular meetings.[105]

## V.     Schenkel's Demand Letters

After Schenkel's complaints went unheeded in his view, his current litigation counsel sent Xyngular a demand letter on September 1, 2011.[106]  Schenkel asked Xyngular's Board of Directors to investigate and pursue claims against Revak, Julich, and Kole for "misappropriation of corporate assets, corporate waste, self-dealing, [and] usurpation of corporate opportunities."[107]

Schenkel alleged six forms of misconduct.  First, the Board's use of GVMS to provide IT services and other administrative support was improper because there was a conflict of interest and GVMS provided substandard service.[108]  Second, the other founders improperly authorized bonuses to GVMS employees, including themselves.[109]  Third, the other founders improperly

---

[101] Rudy Revak Depo. (Dkt. 307, Ex. 1), at 281:1–282:25.
[102] November 23, 2011 Email (Dkt. 307, Ex. 15).
[103] *Id.*
[104] Decl. of Mary Julich (Dkt. 35), ¶ 85.
[105] Decl. of Marc Schenkel (Dkt. 24, Ex. A), ¶ 33; *see* Third Amended Answer, Counterclaim, and Third-Party Complaint (Dkt. 282), ¶ 60.
[106] Wood Jenkins Demand Letter (Dkt. 24, Ex. X).
[107] *Id.* at 1.
[108] *Id.* at 2.
[109] *Id.*

created and operated a company named Nouvara that competed with Xyngular.[110] Fourth, the other founders transferred "certain stock in Xyngular to shareholders of GVMS without apparent consideration."[111] Fifth, the other founders allowed Jensen, the Vice President of GVMS, to take control of Xyngular's management without Board approval.[112] And sixth, Jensen acted contrary to Xyngular's interests by hiring GVMS to provide IT services, even though Jensen's position at GVMS created a conflict of interest.[113] Schenkel closed the letter by stating, "[i]f the board of directors refuses to pursue these claims, [he] will proceed with the appropriate derivative claims."[114]

Schenkel also had his California lawyers send Xyngular a similar demand letter on September 1, 2011.[115] Schenkel demanded that the other founders "remedy the brazen self-dealing in which they have engaged."[116] He closed the letter by stating that, although he had hoped to resolve the matter without resorting to legal action, "given that the company is on the brink of collapse, this no longer seems possible."[117] Schenkel admits that he "intended to initiate litigation" when he sent the two demand letters.[118]

Schenkel personally sent Revak an email the next day.[119] In it, Schenkel said, "I was surprised to receive a call today from Marc Walker informing me that Bruce Jensen had given him instructions that I was not to speak to any employees of Xyngular and that I was not to attend the meetings . . . scheduled for next week."[120] Schenkel further stated that Jensen's

---

[110] *Id.*
[111] *Id.*
[112] *Id.* at 2–3.
[113] *Id.*
[114] *Id.* at 3.
[115] Jones Day Demand Letter (Dkt. 290, Ex. 11).
[116] *Id.* at 1.
[117] *Id.* at 4.
[118] Disc. Resp. Re. Sanctions (Xyngular—Second Set) (Dkt. 290, Ex. 10), at 30.
[119] September 2, 2011 Email from Marc Schenkel to Rudy Revak (Dkt. 24, Ex. Y).
[120] *Id.*

actions "illustrate the improper interference by GVMS employees in Xyngular's business as well as retaliation against [him] for calling for an investigation into the self-dealing, waste, mismanagement and other breaches of fiduciary duties which are threatening the very existance [sic] of Xyngular."[121] Schenkel then asked Revak "point blank" if Jensen's instructions were accurate.[122]

In response, Revak expressed his surprise to receive two letters threatening litigation, even after the other founders had listened to Schenkel's concerns and had tried to reach a resolution.[123] Revak then stated, "At this point, we recognize your role as a shareholder and a distributor."[124] And "[a]s a shareholder you are entitled to basic financials and basic company information at a time mutually agreeable to the company and yourself."[125] Although "you are welcome to attend general distributor events or events that you are invited to," "[i]t is not our intention to you have involved in the operations of the company at any level."[126]

Xyngular appointed three independent directors to its Board in late September 2011 to investigate Schenkel's claims of misconduct.[127] In addition to reviewing the fees that GVMS charged and the services that it provided to Xyngular, the independent directors also reviewed the company's relationship with Schenkel.[128] As part of its review, the Board authorized Jensen to negotiate a resolution with Schenkel in spring 2012.[129] The Board later authorized one of the

---

[121] *Id.*
[122] *Id.*
[123] September 5, 2011 Email from Rudy Revak to Marc Schenkel (Dkt. 24, Ex. Y), at 1.
[124] *Id.* at 2.
[125] *Id.*
[126] *Id.*
[127] *See* Decl. of Mary Julich (Dkt. 35), ¶ 103; September 28, 2011 Board Meeting Minutes (Dkt. 35, Ex. K). The independent directors initially were Dan Murphy, James Northrop, and Russell Fletcher, until Murphy stepped down and Robert Spangler replaced him.
[128] *See* Decl. of Mary Julich (Dkt. 35), ¶¶ 105–09; December 9, 2011 Board Meeting Minutes (Dkt. 35, Ex. L).
[129] April 5, 2012 Board Meeting Minutes (Dkt. 35, Ex. N).

independent directors to negotiate with Schenkel when Jensen was unsuccessful.[130]

At the end of their investigation, the independent directors determined it would not be in Xyngular's best interest to pursue claims against the other founders as Schenkel requested in his demand letters. The independent directors sent Schenkel a letter in early October 2012 notifying him of their decision. They explained that the bonuses paid to GVMS employees were for important services and were in the best interest of the company to ensure continuation of the services; that the creation of Nouvara was meant to improve efficiency by using a centralized management company; that there was no transfer of Xyngular stock to members of GVMS other than the stock issued to Revak, Julich, and Kole when Xyngular was formed; that Jensen provides consulting and management services, but he "does not control Xyngular and has no authority to take action on Xyngular matters other than as directed by the officers and Directors of Xyngular"; and that GVMS provides satisfactory IT services.[131]

## VI. The Lawsuit

Xyngular initiated this lawsuit on September 13, 2012. In its Amended Complaint, Xyngular asserts several claims against Schenkel.

Xyngular first seeks declaratory judgment that Schenkel is entitled to only 2,000 shares of Xyngular stock. While Kole may have caused Xyngular to issue 2,600 shares to Schenkel in early 2011, backdated to January 2010, Kole erred.[132] And even though Xyngular originally claimed that Schenkel was entitled to only 1,623 shares—representing 10% of the 16,230 issued and outstanding shares—Xyngular now concedes that Schenkel is entitled to 2,000 shares.[133] But Xyngular maintains that Schenkel is not entitled to the additional 3% interest—or 600

---

[130] June 8, 2012 Board Meeting Minutes (Dkt. 35, Ex. O).
[131] Letter from Independent Directors (Dkt. 282, Ex. P).
[132] Amended Complaint (Dkt. 71), ¶¶ 14–15.
[133] *Id.* ¶ 15.

shares—to "which he would have been entitled had he properly discharged his duties and responsibilities" as Xyngular's Master Distributor.[134]

Xyngular also seeks a declaration that Schenkel's position as Master Distributor and any rights he may have acquired with that position are terminated. Further, Xyngular claims that Schenkel breached his duties as Master Distributor by failing "to attend company meetings or make reasonable efforts to build the company"; by failing "to train, motivate[,] and recruit distributors"; and by disparaging Xyngular to distributors and other third parties.[135] Xyngular likewise alleges that Schenkel "committed corporate waste and misappropriated Xyngular resources by making unauthorized expenditures on Xyngular's corporate credit card, including in the form of expenditures for lavish parties and other expenditures that were not in Xyngular's interest."[136]

Schenkel responded to Xyngular's allegations with a number of counter- and third-party claims against the Xyngular Parties in October 2012. For example, Schenkel alleges that he is entitled to 2,600 shares of Xyngular stock, that Xyngular promised him a permanent seat on Xyngular's Board of Directors, and that Xyngular promised him a non-terminable position at the top of Xyngular's distribution genealogy.

Schenkel further asserts that Revak, Julich, Kole, and Jensen used a fraudulent scheme to loot Xyngular's assets and enrich themselves. Schenkel alleges that Revak, Kole, Julich, and Jensen knew that Xyngular and Symmetry sold products containing lead in violation of California law, yet concealed that fact and refused to place the proper warnings on their products. And he likewise claims that Revak, Kole, Julich, and Jensen perpetuated sales tax

---

[134] *Id.* ¶ 22.
[135] *Id.* ¶ 26; *see also id.* ¶ 29 (asserting that Schenkel breached the implied covenant of good faith and fair dealing for the same reasons).
[136] *Id.* ¶ 33.

fraud committed by Symmetry. Schenkel alleges that Symmetry represented to its distributors that it was collecting sales tax on their behalf, although Symmetry had not registered to collect sales tax in most states. Symmetry allegedly kept the money it collected as sales tax instead of properly remitting the money to state franchise tax boards.

In support of these assertions, Schenkel insists that "[a] number of brave Xyngular and Symmetry employees, including Ian Swan, acted as whistleblowers informing Mr. Schenkel of serious acts of misconduct and fraud that were being perpetuated by Mr. Revak, Ms. Julich, and Mr. Kole, among others."[137] Schenkel has since admitted, however, that "Ian Swan is the only individual who has claimed to be a whistleblower who provided him documents regarding the Xyngular Parties."[138]

Schenkel attached several documents he received from Swan as exhibits to his original Answer, Counterclaim, and Third-Party Complaint. For instance, Schenkel attached a document detailing the fees Xyngular was to pay to Symmetry;[139] a document summarizing Revak, Julich, and Kole's allegedly self-interested loan transactions;[140] and a 2010 document titled "Shareholder K-1 Information."[141] The court later sealed these exhibits because they contain Symmetry's sensitive commercial information and Xyngular shareholders' personal tax

---

[137] Third Amended Answer, Counterclaim, and Third-Party Complaint (Dkt. 282), ¶ 80; *see also id.* ¶ 87 ("When Mr. Schenkel became aware of these facts through Xyngular's and Symmetry's whistleblowers, he became extremely concerned that Xyngular would be damaged by its association with Symmetry, Mr. Revak, Ms. Julich, and Mr. Kole, and that he would be implicated in the fraud and misconduct."); Answer, Counterclaim, and Third Party Complaint (Dkt. 5), ¶ 66 ("As the retaliation against Mr. Schenkel increased, a number of brave Xyngular and Symmetry employees acted as whistleblowers informing Mr. Schenkel of serious acts of misconduct and fraud that were being perpetuated by Mr. Revak, Ms. Julich, and Mr. Kole, among others."); *id.* ¶ 73 ("When Mr. Schenkel became aware of these facts through Xyngular's and Symmetry's whistleblowers[,] he became extremely concerned that Xyngular would be damaged by its association with Symmetry, Mr. Revak[,] Ms. Julich[,] and Mr. Kole that he would be implicated in the fraud and misconduct.").
[138] Xyngular's Second Set of Disc. Req. Re. Sanctions (Dkt. 290, Ex. 10), at 14.
[139] Fee Agreement (Dkt. 5, Ex. B).
[140] Summary of Self-Interested Loan Transactions (Dkt. 5, Ex. G).
[141] 2010 K-1 Information Sheet (Dkt. 5, Ex. J).

information.[142]

## A. Schenkel's Motion for a Temporary Restraining Order

Schenkel filed a Motion for a Temporary Restraining Order on January 2, 2013, asking the court to restore his 13% ownership interest in Xyngular, to restore his seat on Xyngular's Board of Directors, and to enjoin the other founders from looting the company while litigation is pending.[143]

Schenkel argued in his opening brief that unless the court enters a temporary restraining order, "he will not be able to maintain his claims [or] defend himself against the claims the other founders have brought against him."[144] He also asserted that the other founders gave him altered Board meeting minutes in response to his request in September 2012 after he spoke out against their alleged self-dealing and other wrongdoing.[145] In support, Schenkel attached as an exhibit to his accompanying declaration draft Board meeting minutes from September 28, 2011, "which [he] was able to obtain" from Swan.[146] A side-by-side comparison of the two versions of the minutes shows that the minutes Schenkel obtained from Swan contains information not included the in the version the other founders provided to Schenkel. For example, the signed version of the minutes the other founders provided to Schenkel states:

> **10th order of business-** Discussion by Steven Kole of the current capitalization of the company by its current shareholders.

But the unsigned version of the minutes Schenkel obtained through Swan includes the following additional text:

> There currently are 20,000 shares authorized by the company with 17,200

---

[142] Dkt. 32.
[143] Dkt. 24.
[144] *Id.* at iii.
[145] *Id.* at iv; *see also id.* at xviii ("The minutes which [the other founders] did produce for Mr. Schenkel's inspection had been altered.").
[146] Decl. of Marc Schenkel (Dkt. 24, Ex. A), ¶ 35; *see* Edited September 28, 2011 Board Meeting Minutes (Dkt. 24, Ex. Z).

shares issued and outstanding. There currently are 5 shareholders with Rudy
Revak holding 10,200 shares comprising 59.302% of the outstanding shares.

Schenkel also attached as exhibits to his declaration other documents that he received
from Swan, such as an unredacted document listing Symmetry's members and officers.[147] The
document includes Revak's, Julich's, and Kole's social security numbers, driver license
numbers, birth dates, and home addresses. Schenkel also attached Schedule K-1 Forms for 2010
and 2011.[148] Both documents contain personal tax identifiers. The court later granted
Schenkel's ex parte motion to seal the three exhibits.[149]

In his reply brief in support of his Motion for a Temporary Restraining Order, Schenkel
stated, "The Other Founders have now been confronted with documents they did not know Mr.
Schenkel had."[150] Schenkel submitted with his second declaration twenty-eight documents that
Swan took from GVMS's servers and gave to him. Schenkel explained that the "documents are
true and correct copies of Xyngular corporate records maintained on Xyngular's servers. Each
of the documents were [sic] provided to me by Ian Swan pursuant to my request to review the
books and records of Xyngular."[151]

Swan explained in his supporting declaration, "I am a Xyngular shareholder and an IT
Consultant at Global Ventures/Alytis. Prior to assuming my current responsibilities, I worked
for Symmetry between April 1998 and June 2010 . . . . I was the systems architect and primary
programmer for all Symmetry's worldwide computer/IT infrastructure during that time."[152]
Swan also stated, "Xyngular and Symmetry corporate records created by Steve Kole resided on
Global Ventures [sic] servers and are not password protected or secured in any way. These

---

[147] List of Symmetry Members (Dkt. 24, Ex. B).
[148] *See* Schedule K-1 for 2010 (Dkt. 24, Ex. R); Schedule K-1 for 2011 (Dkt. 24, Ex. S).
[149] Dkt. 31.
[150] Dkt. 38 at iv.
[151] Second Decl. of Mark Schenkel (Dkt. 39), ¶ 20.
[152] Decl. of Ian Swan (Dkt. 40), ¶ 2.

documents are available to anyone. The following documents are true and correct copies of Xyngular corporate records."[153]

The documents referenced by Schenkel and Swan in their declarations—and attached as exhibits to the declarations—include draft Board meeting minutes from Xyngular's September 2011, December 2011, and April 2012 Board meetings. They also include other corporate documents, such as documents concerning Xyngular's shareholder distributions; taxable income; and earnings distributions, one of which is dated May 1, 2012.

## B. The January 23, 2013 Hearing

The court held an evidentiary hearing on the Motion for a Temporary Restraining Order on January 23, 2013. During preliminary statements, counsel for the Xyngular Parties argued:

> The next issue, before I get to the elements for a preliminary – for a temporary restraining order, is those who come to you must come to you seeking equity, must come to you having done equity.
>
> You can imagine if you were practicing as a lawyer sitting where I was at 8:00 o'clock on Tuesday night – or Monday night, when I get two declarations, one from Mr. Swan and a second one from Mr. Schenkel. And it was interesting just before this hearing Ms. Wood asked me the question when am I going to tell them where is the location of these documents. And what had happened was they got access to the server of Xyngular, and they took documents.
>
> They say that Mr. Schenkel has said I don't have access to any of the documents of board meetings. He submitted in his first declaration – we'll be asking him some questions about where he got those documents from. He had documents that show metadata, and those were not authorized, your honor, that those documents be given to Mr. Schenkel, or that Mr. Swan give them to Mr. Schenkel.
>
> It's no different than if I had gone to Ms. Wood's office, if it were unlocked, and I took a document and I – and I then submitted it to this court without anybody knowing about it. And that kind of wild west cowboy discovery tactic is wrong, and let me tell you why. Because if you go look at the exhibits attached to Mr. Swan's and Mr. Schenkel's declarations, there are board minutes, and there are a bunch of iterations of those board minutes. There's advice of their counsel in those minutes, and that's exactly why courts should

---

[153] *Id.* ¶ 6.

not sanction that kind of cowboy discovery where they go out and reach out and take discovery and explain, well, the reason I don't – I can do this is because you didn't have a password.

They shouldn't be performing that kind of discovery. We should be able to protect attorney-client privileged communications with a client. They've taken those documents on their own, taken the law into their own hands. They have not done equity. And when they come to this court with unclean hands, this court should not give them equity.[154]

Schenkel's counsel and the court then had the following discussion:

Ms. Wood: The plaintiffs and third-party defendants have produced not a single document in this case. They produced not a single document in their initial disclosures.

. . . .

We have produced every single document in our possession, every single minute, every single everything. We have never hidden a single thing from them.

Furthermore, we never asked Mr. Swan to get us documents. It was not a discovery trick. Mr. Swan is himself a whistleblower, as is Mr. Schenkel, and they are protected under both federal and state law. Mr. Swan's declaration said that he reported his concerns to the F.B.I., and they jointly talked to the F.B.I. about –

The court: You know, I'll listen to [any] argument you'd like to make about this. It's not going to affect my analysis of the T.R.O. I fully expect that – well, fully expect. I will not be the slightest bit surprised if there's some motion practice about all this. I anticipate there very likely will be. We're not going to resolve those issues today.

Ms. Wood: Your honor, but my integrity has been impugned, and I think I have a chance to respond to it. The doc – both Mr. Swan and Mr. Schenkel are shareholders of Xyngular. The argument that is being made by Mr. Hale is they are entitled to filter the information that goes to the shareholders.

. . . .

But the shareholders are entitled, when they make a demand, to the minutes of the board meeting, and you don't get to keep sets of

---

[154] TRO Hearing Tr. (Dkt. 139), at 27:7–28:19.

minutes for people you like and sets of minutes for people you don't like. And both pursuant to demand, and as shareholders, Mr. Schenkel made the demand as members of the board. He was entitled to those.

Now, I had nothing to do with their access, and I did not direct anybody to get those documents, neither did anybody else from our offices. But for them to produce not a single document in their initial disclosures, and for us to produce absolutely everything we have, including anything that Mr. Schenkel got from Mr. Swan, and for them to say that somehow we were trying to hide something, that we had breached some duty, that is not the law.

. . . .

The court: They're separate issues in my mind. I'm reticent to get into it because it seems to me that the parties are undoubtedly going to conduct some discovery on this, and if it's important to the parties and there have been violations either of rule 26 or rule 37 or the shareholders, it will be briefed by the parties and I'll decide it then. It seems to me separate questions about a party's obligation to produce documents and describe documents in their initial disclosures and somebody accessing a server, pulling documents without – with or without authorization. I'm not making any findings today – separate questions. Concerning to the court in whatever instance, but we'll resolve it when we get to it. It's not going to affect the outcome of the T.R.O. today.[155]

The court went on to receive testimony from Schenkel, Julich, and Swan. Shortly after Swan began testifying, and in response to a line of questions about the source of documents he provided to Schenkel, the court advised Swan of his Fifth Amendment constitutional right to be free from self-incrimination. And after a brief exchange between the court and Swan, Swan left the courtroom. He did not return.[156]

---

[155] *Id.* at 40:16–43:21.

[156] Jensen sent Swan an email on January 24, 2013, the day after the court held a hearing on Schenkel's Motion for a Temporary Restraining Order. (Dkt. 169, Ex. 5.) In the email, Jensen said, "As you are aware Tuesday, January 22, we learned through your affidavit in the Schenkel lawsuit, and through Schenkel's testimony, that over the course of several months, if not years, you have been sharing confidential files that belong to Symmetry, Xyngular, Alytis and other affiliated entities with people who have no right to those documents." Jensen then said, "I'm sure you can appreciate that your sharing of confidential files of Alytis' customers with outside third parties is a serious breach of trust. Until we sort out these issues, we cannot give you access to Alytis' computer files or allow you into our

Later in the hearing, counsel for the Xyngular Parties again argued:

> We have a man who has, without the knowledge or authority of the management of the company, taken documents, confidential documents, from the server of a company. That's not how you get documents. I don't care, your honor, whether you're a whistleblower, whether you're an attorney, it doesn't matter, you cannot act illegally to obtain documents.
>
> . . . .
>
> When they produced to us a disk that has an enormous amount of documents that clearly came from the company, and we don't know how they got them, how in the world these got into the – apparently into the public forum, as you can guess that is an enormous concern. And until we received the declaration of Mr. Swan, we didn't know how that happened.
>
> . . . .
>
> Mr. Swan stole documents unauthorized from the company, he gave them to Mr. Schenkel, who is now using them in this proceeding. And as you know, injunctive relief is an equitable proceeding. If you want relief from the court, you come with clean hands. And if you don't come with clean hands, you're not entitled to equitable relief. And it is not clean hands to come into a court and produce documents that you know were taken unauthorized from a source and use them in the proceeding, and that's what we believe the testimony is.[157]

In response, Schenkel's counsel argued:

> Mr. Schenkel and Mr. Swan are owners of [Xyngular]. They did not take any documents and bring them outside the realm of the company, except for to testify in this proceeding as a witness.
>
> So this is not the situation, as Mr. Hale suggested, as perhaps we going to his office and stealing documents from him. The better analogy, your honor, is that somebody at his office discovers that the company is involved with illegal conduct and takes documents and goes to the Federal Bureau of Investigation to report the illegal conduct.
>
> It was not just this – the ownership, your honor. Mr. Schenkel was very clear. They also discussed tax fraud and tax evasion. That was the primary purpose of going to the F.B.I. was that these two individuals saw that there was tax

---

offices." But "[w]e may be able to figure out a way to pay you a retainer fee for future contractor services until we can work through these issues."

[157] TRO Hearing Tr. (Dkt. 139), at 116:5–117:21.

fraud and tax evasion being committed, and they did not want to be personally involved in that.[158]

The hearing continued, and the parties eventually finished examining the witnesses. The court ultimately denied Schenkel's request for a temporary restraining order because he failed to show that he would suffer irreparable harm in the absence of injunctive relief.

### C. The Xyngular Parties' First Motion for Dispositive Sanctions

A little over two months later, the Xyngular Parties filed their first motion for terminating sanctions.[159] The Xyngular Parties alleged that (1) Schenkel improperly encouraged Swan to steal documents belonging to Xyngular, Symmetry, GVMS, and other companies that were kept on GVMS's servers; (2) Schenkel knowingly and improperly received the documents from Swan and shared them with his counsel in this case; (3) Schenkel failed to return the documents, including privileged, confidential, and sensitive documents to their owners; and (4) Schenkel improperly used the stolen documents to support his Motion for a Temporary Restraining Order.

Schenkel denied the allegations against him. He argued in his opposition to the Xyngular Parties' motion that Swan was authorized to access all the documents on GVMS's servers, and that Swan voluntarily gave documents to Schenkel confirming Schenkel's ownership interest in Xyngular and showing allegedly illegal conduct by the Xyngular Parties. Schenkel maintained that he did not obtain the documents from Swan for use in this litigation, but instead to blow the whistle on the Xyngular Parties before litigation.

Schenkel also made a number of allegations of wrongdoing against the Xyngular Parties in his opposition brief. Most notably, he alleged that the Xyngular Parties retaliated against him and Swan for blowing the whistle on their illegal activities, and that they spoliated evidence. For instance, Schenkel stated that the Xyngular Parties scrubbed his name from an October 2009 IRS

---

[158] *Id.* at 118:24–119:14.
[159] Dkt. 52.

Form 2553, which lists the name of each Xyngular shareholder. He further asserted that the Xyngular Parties altered Board meeting minutes and untruthfully claimed that other minutes no longer existed. And he claimed that Julich and her assistant "spent several days shredding documents," and that Julich's husband wiped Kole's desktop computer "down to the metal."[160]

Schenkel also alleged that "[n]umerous witnesses stand ready to provide documents and testimony supporting Mr. Schenkel's claims of fraud and illegal conduct. . . . [W]itnesses also stand ready to testify regarding Ms. Julich's and Mr. Kole's spoliation of documents."[161] But these "[p]otential witnesses are understandably concerned that they could be terminated or retaliated against for providing truthful testimony" because the Xyngular Parties allegedly retaliated against Swan.[162]

Finally, Schenkel stated that "[he] and his counsel watched together [on September 7, 2011,] as e-mails between Mr. Schenkel and the Other Founders were being remotely deleted from Mr. Schenkel's email account. He was powerless to stop it."[163] "Something similar appears to have been done to counsel's computer system. A folder of relevant e-mails on counsel's computer system has been mysteriously emptied."[164]

Schenkel later alleged that "Rudy Revak, Steven Kole[,] and Mary Julich, as well as other Xyngular, GVMS, or Symmetry employees may have knowledge of the deletion of emails from Mr. Schenkel's email account."[165] Schenkel eventually backtracked from these allegations and conceded that he does not contend that the Xyngular Parties were responsible for the hacking

---

[160] Dkt. 57 at xviii.
[161] Dkt. 57 at 33.
[162] *Id.*
[163] *Id.* at xviii. Schenkel later contradicted these allegations when he stated in response to an interrogatory that he was at home with Sonja Zandsta and his daughter "when he first discovered that his email account had been hacked." (Dkt. 100, Ex. C.)
[164] Dkt. 57 at xviii.
[165] Mary Julich's Second Set of Disc. Resp. Re. Claims (Dkt. 290, Ex. 52), at 3.

of his email account.[166]

## D. The May 20, 2014 Hearing

The court held a hearing on the Xyngular Parties' motion for terminating sanctions on May 20, 2014. The court expressed at the outset concern about the gravity of each party's allegations and the integrity of the judicial proceedings. The court then stayed the case so the parties could conduct discovery on the allegations of misconduct and file sanctions motions, if any, based on a more complete record. The court explained:

> Based on the allegations and the evidence presented both in the Plaintiff's moving papers and in the opposition filed by Mr. Schenkel, I have grave concerns that I think we're required to address before we reach the merits of any claims in this case.
>
> I think I have an obligation to ensure the integrity of these proceedings, to ensure the authenticity of the evidence that we're receiving and considering in connection with the merits, and, moreover, I think an obligation to ensure that the parties who are here availing themselves of this Court belong here and they're entitled to seek the relief that they're asking of the Court.
>
> . . . .
>
> My view is we have to get to the bottom of that before we reach any of the claims on the merits in this case, and we're going to. So I have come today prepared with some thoughts to share with all of you and a proposal for a plan.
>
> . . . .
>
> This is what I propose. I think the record before me is incomplete to make a complete determination about the relief that Xyngular and the Third-Party Defendants are seeking. I think I don't have all the information I need to make a ruling.
>
> Similarly, the opposition filed by Mr. Schenkel raises grave concerns in my mind about the conduct of Xyngular and some of the Third-Party Defendants. I think we need a complete record about that. If there's going to be a motion, and there may not be one forthcoming – we'll talk about a schedule in a moment. All of those issues I think should be resolved together after an opportunity for discovery limited on these issues. I am going to stay the case, everything in the case, save for those issues relating to the motion for

---

[166] Xyngular's First Set of Disc. Resp. Re. Sanctions (Dkt. 290, Ex. 53), at 25–26.

terminating sanctions and any motion Mr. Schenkel may wish to file relating to any sanctionable conduct that you think may have occurred concerning document destruction, whatever discovery abuses or issues you think there are, doctoring documents, fabricating evidence, whatever it is, there's a whole host of general allegations in your opposition.

. . . .

Let me share a few additional thoughts with you that you can share with your clients. I take these allegations in these papers extremely seriously. I think this record potentially supports terminating sanctions against one or more parties in this case. It's not perfectly clear to me, but based on general allegations in these papers, there may be obligations that arise that require me to make referrals to the U.S. Attorney's Office or the Office of Professional Conduct. I don't know how those cards are going to fall, but we're going to understand all of the evidence in this case and see where it takes us.[167]

Later in the hearing, Schenkel's counsel orally moved for the undersigned's disqualification. Schenkel's counsel argued that the undersigned delayed the proceedings to Schenkel's disadvantage and made comments exhibiting bias during the hearing on Schenkel's Motion for a Temporary Restraining Order.

### E. Schenkel's Motion to Disqualify

Schenkel filed a written motion to disqualify two weeks later.[168] He argued that the undersigned's comments and actions created an appearance of partiality and bias against him that "threaten[ed] [his] due process rights to a fair trial."[169] For example, Schenkel claimed that the court expressed opinions and conclusions without evidentiary support that raise a reasonable question of partiality, inappropriately drove Swan—Schenkel's primary witness—off the stand, improperly fashioned an ad hoc summary proceeding to determine criminal liability, and ordered Schenkel to file a motion for sanctions to create an illusion of evenhandedness.

---

[167] Hearing on the Xyngular Parties First Motion for Sanctions (Dkt. 167), at 4:9–7:8; *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("[A] court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud.").

[168] Dkt. 169.

[169] *Id.* at iii.

The court denied Schenkel's motion to disqualify.[170]  The court explained that its opinions and observations were insufficient to require disqualification, that the court's warnings to Swan were not inappropriate, that the court ordered the parties to conduct discovery on the serious allegations of misconduct made by both parties so it could get to the bottom of the allegations, and that the court invited—but did not order—Schenkel to file a motion for sanctions if he and his counsel were able to substantiate his allegations of misconduct.

The court then denied the Xyngular Parties' motion for sanctions without prejudice at a later status conference.

## VII.    The Current Motions for Terminating Sanctions

The parties engaged in additional discovery and filed cross-motions for terminating sanctions.  These are the motions now before the court.

Schenkel contends in his Motion for Sanctions that terminating sanctions against the Xyngular Parties are appropriate because the Xyngular Parties have habitually violated their duty of candor to the court and spoliated evidence.  He maintains that the Xyngular Parties committed misconduct in four ways.

First, Schenkel argues that the Xyngular Parties filed this lawsuit in bad faith, and that their Amended Complaint rests upon allegations they now admit are false or lacking in evidentiary support.  Schenkel asserts that Xyngular alleged in bad faith that he accepted and held the position of Master Distributor.  Schenkel submits the deposition testimony of Xyngular's corporate representative admitting that Schenkel and Xyngular did not finalize an agreement that would have made him Master Distributor.[171]  Schenkel also maintains that Xyngular alleged in bad faith that he breached his obligations to the company.  He again points

---

[170] Dkt. 173.
[171] *See* Xyngular Rule 30(b)(6) Depo. (Dkt. 289, Ex. 1), at 100:19–25, 162:6–23, 164:15–20.

to the deposition testimony of Xyngular's corporate representative that he worked hard during his time as the Interim Sales Director and that he helped the company grow.[172] He contends that Xyngular has presented no evidence to the contrary. Schenkel further argues that Xyngular alleged in bad faith and without any documentary evidence that he wasted corporate resources. Schenkel presents the testimony of Xyngular's Vice President of Finance, Graser, who testifies that he could not recall Schenkel making any improper expenditure.[173] Schenkel also asserts that Xyngular did not mistakenly issue him 2,600 shares, and that Xyngular alleged in bad faith that he is entitled to fewer shares.

Second, Schenkel contends that the Xyngular Parties committed perjury in their discovery responses. Schenkel argues that the Xyngular Parties committed perjury when they denied selling expired products by fraudulently relabeling products with new expiration dates. He also claims that the Xyngular Parties committed perjury when Symmetry stated in response to an interrogatory that "it is not aware of any foreign state, federal, state, or local taxes that have not been paid."[174] Symmetry also denied committing "acts of perjury, fraud, tax fraud, tax evasions, failure to pay tax, . . . and the failure to disclose the existence [of] lead or other toxic substances (as defined by California state law) in Symmetry's products," and it denied making any agreements to keep those acts confidential.[175] Xyngular similarly denied that any of its "officers, employees and/or board members were aware of Symmetry's failure to pay foreign, federal, state and /or local taxes."[176] Yet, as Schenkel notes, Kole testified that "there was a period early in [Symmetry] where there were amounts designated as sales tax on orders to the

---

[172] *See id.* at 127:4–128:6, 199:14–200:10.
[173] *See* Bart Graser Depo. (Dkt. 289, Ex. 5), at 56:3–7.
[174] Symmetry Corporation's Objections and Responses to First Set of Interrogatories (Dkt. 289, Ex. 8), at 11.
[175] *Id.* at 9–10.
[176] Xyngular Corporation's Objections and Responses to Amended First Set of Interrogatories (Dkt. 289, Ex. 10), at 32.

distributor that were charged to the distributor that registrations to several states, many states, were not undertaken and, therefore, not paid."[177]  The money that was collected but not paid was "retained in the company for corporate uses."[178]

Schenkel also asserts that the Xyngular Parties committed perjury when they denied selling any products containing impermissible amounts of lead.  Schenkel alleged in his Second Amended Counterclaim and Third-Party Complaint that he was

> informed that Symmetry had been notified that numerous products it was selling, including a multivitamin for children, were unsafe because they contained lead and were potentially harmful to the public.  Symmetry, however, concealed this fact from their customers and distributors and was continuing to sell the products without any warning.

The Xyngular Parties denied this allegation in their Answer "for lack of information," and "expressly den[ied] that Symmetry is or was selling unsafe products or products that are potentially harmful to the public."[179]  Symmetry, however, was sued in late 2010 for distributing products containing lead without warnings required by California law.[180]  Symmetry settled that lawsuit by entering into a Consent Judgment and agreeing to pay thousands of dollars in fines.[181]  Symmetry admitted to this after the Xyngular Parties filed their Answer and in response to an interrogatory:

> [A] lawsuit was brought against it . . . regarding the alleged lead content of its products.  Some of Symmetry's products were determined to contain ingredients containing a lead content beyond California's legal limits.  Symmetry settled this lawsuit with a small monetary payment and by providing a warning to California residents who purchase such products.[182]

---

[177] Steve Kole Depo. (Dkt. 289, Ex. 11), at 260:24–261:4; Rudy Revak Depo. (Dkt. 289, Ex. 7), at 145:6–11 ("To my knowledge, in the early days of Symmetry we were collecting some sales taxes in states that we weren't registered in, and we weren't sure whether or not we needed to pay those taxes in those states.  And so yea, there was a period of time that we collected those taxes in some states where we weren't registered.").

[178] Steve Kole Depo. (Dkt. 289, Ex. 11), at 261:12–14.

[179] Third-Party Defendants' Answer to Marc Schenkel's Second Amended Counterclaim and Third-Party Complaint (Dkt. 129), ¶ 84.

[180] *See* Consent Judgment, *Environmental Research Center v. Symmetry Corp.* (Dkt. 289, Ex. 14), at 2.

[181] *See id.* at 5.

[182] Symmetry Corporation's Objections and Responses to First Set of Interrogatories (Dkt. 308, Ex. 12), at 13.

Third, Schenkel argues that the Xyngular Parties made numerous false statements to the court during motion practice. Schenkel claims that the Xyngular Parties misrepresented that he and Swan were neither Xyngular employees nor whistleblowers. He also contends that the Xyngular Parties misrepresented that he never told Xyngular's management that he was getting documents from Swan, and misrepresented that they did not know Swan was giving documents to Schenkel.

Fourth, Schenkel argues that the Xyngular Parties altered and spoliated documents before and after this litigation started, and then denied doing so in response to his requests for admission. For example, Xyngular denied that (1) it destroyed, altered, or spoliated documents after Schenkel sent his demand letter in September 2011; (2) it produced altered board meeting minutes to Schenkel in September 2012; and (3) it was aware of any persons who were involved in any destruction, alteration, or spoliation of documents.

But, Schenkel insists, the Xyngular Parties gave him altered Board meeting minutes in September 2012 after he requested to review Xyngular's books and records. He argues that the minutes Swan gave him contain information that Kole deleted from the finalized, signed minutes that Xyngular gave him. Schenkel further claims that the Xyngular Parties spoliated evidence when Kole instructed Graser to delete any reference to stock appreciation rights from a financial report that Graser was preparing for Schenkel in response to his demand letter. Schenkel also presents Swan's deposition testimony that Julich had Mali Sonnier, an employee working under Julich's direction, shred "a lot" of documents over the course of about two days around the time this litigation began.[183] And he contends that Sonnier deleted an electronic document relating to Swan's employment status, and that Julich's husband wiped and reformatted Kole's computer.

---

[183] *See* Ian Swan Depo. (Dkt. 289, Ex. 13), at 227:11–229:12.

Lastly, Schenkel asserts that the Xyngular Parties erased his name from an October 2009 IRS Form 2553, which lists the name of each Xyngular shareholder.

Schenkel submits that the Xyngular Parties' pattern of perjury and fraud on the court has subverted the interests of justice and warrants terminating sanctions. Schenkel also asks the court to deem admitted any matters about which the Xyngular Parties have provided perjured statements, and to impose monetary sanctions on the Xyngular Parties to compensate for attorney time spent establishing the Xyngular Parties' misconduct.

On the other hand, the Xyngular Parties reassert in their current motion that terminating sanctions against Schenkel are appropriate because his wrongful conduct has irreparably undermined the legitimacy of this litigation.

The Xyngular Parties contend that (1) Schenkel wrongfully encouraged Swan to steal documents belonging to the Xyngular Parties and other companies whose documents and information were kept on GVMS's servers, (2) Schenkel knowingly received and reviewed those stolen documents, (3) Schenkel then shared those stolen documents with his current litigation counsel, (4) Schenkel failed to return those stolen documents to their owners, (5) Schenkel has used those stolen documents in this litigation, and (6) Schenkel has engaged in a course of action to cover up and rationalize his wrongful conduct.

The Xyngular Parties further maintain that many of the documents Schenkel obtained contain privileged, confidential, and sensitive information, and that many of the documents would only have been produced in this case—if at all—pursuant to an attorney eyes only designation under the court's standard protective order. The Xyngular Parties also note that Schenkel withheld more than 125 documents—created in either 2011 or before Xyngular filed

this lawsuit in September 2012—during discovery on the basis of the work product doctrine.[184]

The Xyngular Parties urge the court to dismiss Schenkel's claims and enter other appropriate sanctions to punish Schenkel's wrongful conduct, to deter future litigants, and to engender public trust in the integrity of the judicial process. The Xyngular Parties ask the court to strike Schenkel's answer and affirmative defenses, to enter default against him,[185] and to award them the attorneys' fees and costs incurred conducting discovery on this issue and presenting it to the court.[186]

## LEGAL STANDARDS

Both Schenkel and the Xyngular Parties urge the court to levy sanctions against the other pursuant to the court's inherent powers. Schenkel also moves the court to impose sanctions against the Xyngular Parties under Federal Rules of Civil Procedure 26 and 37. The court discusses each asserted basis for sanctions in turn.

## I. Inherent Powers

Federal courts have very broad discretion to exercise their inherent powers to sanction a full range of litigation misconduct that abuses the judicial process.[187] These inherent powers are

---

[184] *See* Marc Schenkel's Privilege Log (Dkt. 290, Ex. 12). "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A).

[185] The Xyngular Parties ask the court to enter default judgment against Schenkel on all of Xyngular's affirmative claims. The court interprets the Xyngular Parties' request as one for default—not default judgment—because if the court were to grant the request, the court would first enter default against Schenkel before entering default judgment against him.

[186] The court held a hearing on the cross-motions for sanctions on January 12, 2016. Two weeks after the hearing, Schenkel filed a second motion to disqualify the undersigned. (Dkt. 330.) Schenkel argued that there was a conflict of interest between the undersigned's law clerk and the Third-Party Defendants' counsel, and that the undersigned has shown actual bias against Schenkel. The court denied the motion in its February 4, 2016 Memorandum Decision and Order, concluding that the undersigned's law clerk does not have a conflict of interest and that the undersigned's comments and actions in this case have not created an appearance of partiality and bias against Schenkel. (Dkt. 332.)

[187] *See Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1320 (10th Cir. 2011) ("We have said that district courts enjoy 'very broad discretion to use sanctions where necessary to insure that lawyers and parties fulfill their high duty to insure the expeditious and sound management of the preparation of cases for trial.'" (quoting *In re Baker*, 744 F.2d 1438, 1440 (10th Cir. 1984) (en banc))); *Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 765 (10th Cir. 1997) (stating that federal courts have the inherent power "to sanction conduct that abuses the judicial process"); *see also Chambers v.*

not governed by any rule or statute.[188] They are instead "necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."[189]

Although "our legal system strongly prefers to decide cases on their merits,"[190] federal courts may dismiss a party's case for misconduct that abuses the judicial process.[191] Dismissal, however, is a "severe sanction" that "should be imposed only if a 'lesser sanction would not serve the ends of justice.'"[192] For this reason, dismissal is appropriate only when the party seeking sanctions proves "willfulness, bad faith, or some fault"[193] by clear and convincing evidence.[194]

Conduct amounts to "bad faith" if it shows "'intentional or reckless disregard' of the rules."[195] But actual ill will is not required; "substantial and prejudicial obduracy" or conduct that delays or disrupts the litigation can be enough.[196] And "fault" concerns "'the reasonableness

---

*NASCO, Inc.*, 501 U.S. 32, 43 (1991) ("Courts of justice are universally acknowledged to be vested, by their creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates."); *id.* at 46 (noting that "the inherent power extends to a full range of litigation abuses").

[188] *Chambers*, 501 U.S. at 43.

[189] *Id.* (citation omitted) (internal quotation marks omitted).

[190] *Lee*, 638 F.3d at 1321.

[191] *See Chambers*, 501 U.S. at 44–45 (stating that federal courts have discretion under their inherent powers to "fashion an appropriate sanction for conduct which abuses the judicial process," including "outright dismissal of a lawsuit"); *see also id.* at 44 ("[T]he inherent power also allows a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court."); *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993) (holding that "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process, the court has the inherent power to dismiss the action").

[192] *LaFleur v. Teen Help*, 342 F.3d 1145, 1151 (10th Cir. 2003).

[193] *Chavez v. City of Albuquerque*, 402 F.3d 1039, 1044 (10th Cir. 2005) (citation omitted) (internal quotation marks omitted).

[194] *See, e.g.*, *Shepherd v. Am. Broad. Co.*, 62 F.3d 1469, 1476–78 (D.C. Cir. 1995) (holding that the inherent powers sanction of dismissal requires a showing of misconduct by clear and convincing evidence); *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) (stating that a court may exercise its inherent powers to dismiss a party's action for committing fraud on the court if the fraud is shown by clear and convincing evidence); *Rhodes v. LaSalle Bank, N.A.*, 2005 WL 281221, at *2 (N.D. Ill. Feb. 1, 2005) ("Dismissal is proper . . . if the court makes a finding 'by clear and convincing evidence of willfulness, bad faith, or fault.'" (quoting *Maynard v. Nygren*, 332 F.3d 462, 468 (7th Cir. 2003))).

[195] *Rhodes*, 2005 WL 281221, at *2 (quoting *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992)).

[196] *Arnold v. Cnty. of El Dorado*, 2012 WL 3276979, at *3 (E.D. Cal. Aug. 9, 2012); *Eagle Hosps. Physicians, LLC v. SRG Consulting, Inc.*, 2007 WL 2479290, at *3 (N.D. Ga. Aug. 28, 2007).

of the conduct—or lack thereof—which eventually culminated in the violation.'"[197] A movant makes either of these showings by clear and convincing evidence "if the evidence places in the ultimate factfinder an abiding conviction that the truth of its factual contentions [is] highly probable."[198]

Because dismissal is a harsh sanction, it must be exercised with restraint.[199] The Tenth Circuit Court of Appeals has articulated five so-called *Ehrenhaus* factors that district courts should evaluate when considering whether to impose the sanction of dismissal: "(1) the degree of actual prejudice to the opposing party, (2) the degree of interference with the judicial process, (3) the litigant's culpability, (4) whether the litigant was warned in advance that dismissal was a likely sanction, and (5) whether a lesser sanction would be effective."[200]

## II.    Federal Rule of Civil Procedure 26

Federal Rule 26(g) requires parties to sign each discovery request, response, and objection.[201] Rule 26 further provides:

> By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry:
>
> (A) with respect to a disclosure, it is complete and correct as of the time it is made; and
>
> (B) with respect to a discovery request, response, or objection, it is:
>
> (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;
>
> (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of

---

[197] *Rhodes*, 2005 WL 281221, at*2 (quoting *Marracco*, 966 F.2d at 224).

[198] *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1228 (10th Cir. 2007) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

[199] *Chavez*, 402 F.3d at 1044; *see also Chambers*, 501 U.S. at 44 ("Because of their potency, inherent powers must be exercised with restraint and discretion.").

[200] *LaFleur*, 342 F.3d at 1151 (citing *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992).

[201] Fed. R. Civ. P. 26(g).

litigation; and

> (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.[202]

If a party violates Federal Rule 26(g) without substantial justification, the court "must impose an appropriate sanction," such as "an order to pay the reasonable expenses, including attorney's fees, caused by the violation."[203]

## III.    Federal Rule of Civil Procedure 37

Federal Rule 37 provides sanctions for failure "to obey an order to provide or permit discovery."[204]  Schenkel cites to nonbinding authority imposing sanctions in the absence of an order:

> In this case, although there has been no specific court order, we believe such an order is not required to provide notice that parties must not engage in such abusive litigation practices as coercing witness testimony, lying to the court, and tampering with the integrity of the judicial system.  Because all litigants are presumed to know that contumacious conduct of this sort is absolutely unacceptable, we can properly consider the sanctions available under Rule 37.[205]

As explained below, Schenkel has failed to prove that the Xyngular Parties engaged in sanctionable conduct.  The court therefore declines to address the scope of Rule 37.

## ANALYSIS

The court now turns to the two motions before it for terminating sanctions.  The court first analyzes Schenkel's Motion before turning to the Xyngular Parties' Motion.

In the end, the court concludes that Schenkel engaged in sanctionable conduct and that terminating sanctions are warranted.  The court also concludes that Schenkel has not shown at

---

[202] *Id.*
[203] *Id.*
[204] Fed. R. Civ. P. 37(b)(2)(A).
[205] *Quela v. Payco-Gen. Am. Creditas, Inc.*, 2000 WL 656681, at *6 (N.D. Ill. May 18, 2000).

this stage of the proceedings that the Xyngular Parties engaged in sanctionable conduct.

## I. Schenkel's Motion for Dispositive Sanctions

Schenkel urges the court to exercise its inherent powers and its powers under Rules 26 and 37 to enter dispositive sanctions against the Xyngular Parties for engaging in pervasive misconduct. Schenkel maintains that the Xyngular Parties filed this lawsuit in bad faith, that they have committed perjury in their discovery responses and during motion practice, and that they spoliated documents in anticipation of litigation and after this litigation began and then lied about doing so. The court addresses each contention in turn.

### A. Bad Faith Pleadings

Schenkel first argues that that the Xyngular Parties filed their pleadings in bad faith because discovery has shown that their claims lack evidentiary support. Schenkel moves the court to sanction the Xyngular Parties pursuant to its inherent powers.

Federal courts may sanction misconduct under their inherent powers even if the same conduct is sanctionable under one of the Federal Rules.[206] Although Schenkel invokes in his motion the court's inherent powers instead of Federal Rule 11, "ordinarily . . . court[s] should rely on Rule 11 to impose sanctions" "[w]here both Rule 11 and the court's inherent power are available."[207] Accordingly, the court evaluates Schenkel's argument that the Xyngular Parties filed their pleadings in bad faith using the pleading standards in Rule 11.

Rule 11 requires that factual contentions in pleadings "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for

---

[206] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991).
[207] *Chavez v. City of Albuquerque*, 232 F.3d 900, *2 n.1 (10th Cir. 2000) (unpublished); *see also Chambers*, 501 U.S. at 50 ("[W]here there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.").

further investigation or discovery."[208]  Nothing in the Rule states that a factual contention is made in bad faith simply because it is ultimately proven false.  Nor does the Rule state that factual contentions are made in bad faith if they are controverted by an opposing party's evidence.  Rather, the sole inquiry is whether there is (or likely will be) evidentiary support for the factual contention.  The court examines the Xyngular Parties' four purportedly bad faith factual contentions in turn.

First, Xyngular alleged in its Amended Complaint that Schenkel failed to perform his duties as the company's Master Distributor.  Schenkel argues that Xyngular alleged in bad faith that he accepted and held that position.  Schenkel points to the deposition testimony of Xyngular's corporate representative that Schenkel and Xyngular did not finalize an agreement that would have made him Master Distributor.  But as discussed above, Xyngular has presented evidence that Schenkel became Xyngular's Master Distributor or at least assumed a role that entailed the same duties as Master Distributor.  While he did not want to be referred to as Master Distributor, the duties remained similar.  And most importantly, the substance of the allegation is that Schenkel did not fulfill his duties—not that his official title was "Master Distributor."  Xyngular had evidentiary support to allege that Schenkel failed to fulfill the duties of Master Distributor.

Second, Schenkel contends that Xyngular alleged in bad faith that he breached his obligations to the company.  Schenkel again submits the deposition testimony of Xyngular's corporate representative that he worked hard during his time as Interim Sales Director and helped the company grow.  He contends that Xyngular has presented no evidence to the contrary.  But Xyngular argues that there is evidence to support its allegation that Schenkel breached his duties to the company shortly after he assumed the position—or the responsibilities—of Master

[208] Fed. R. Civ. P. 11(b)(3).

Distributor.  Julich testifies in her declaration that by September 2011 Schenkel had substantially stopped participating in conference calls with and recruiting sales leaders, stopped traveling to conduct distributor meetings and trainings, and stopped training distributors.  As stated, the Rule 11 question is not whether Schenkel can present contradictory evidence.  Rather, the question is whether Xyngular had evidentiary support for its allegation.  And here, Xyngular had evidentiary support to allege that Schenkel breached his obligations to the company.

Third, Xyngular has alleged that Schenkel wasted corporate assets by misusing his corporate credit card and charging expenditures that were not in Xyngular's best interest.  Schenkel asserts that Xyngular made this allegation in bad faith and without evidentiary support.  Schenkel points to Graser's testimony that he could not recall whether Schenkel made any improper charges on Xyngular's corporate credit card.  Schenkel also asserts that Xyngular has not produced any credit card statements or accounting records showing that he wasted corporate assets.  Xyngular, however, presents the testimony of Walker and Julich, both of whom state that Schenkel made unauthorized expenditures and threw parties that could create a negative image for the company.  This sworn testimony provides evidentiary support for the Xyngular Parties' corporate waste allegations.

Finally, Xyngular alleged that Schenkel is entitled to only 2,000 shares of stock, instead of the 2,600 shares to which Schenkel claims he is entitled.  Schenkel argues that Xyngular made this allegation in bad faith because all of Xyngular's prelitigation records show that he is entitled to 2,600 shares and he was repeatedly paid distributions on 2,600 shares.  But Xyngular has presented evidence that it mistakenly issued Schenkel 2,600 shares, that the stock certificate incorrectly reflects that he owns 2,600 shares, and that the 600 shares in dispute were to vest only upon certain sales objectives being met.  This is enough evidence to conclude that Xyngular

did not bring the claim in bad faith.

At bottom, Schenkel urges the court to sanction Xyngular because, in his view, the evidence overwhelmingly supports his position on Xyngular's claims. Schenkel may present this competing evidence at summary judgment and at trial to argue that Xyngular's claims and allegations against him are meritless.[209] But he has not shown that Xyngular made them in bad faith and without any evidentiary support. The court concludes that Schenkel has not proved by clear and convincing evidence that the Xyngular Parties exercised bad faith in their pleadings.

## B. Perjury and Misrepresentations

Schenkel next asserts that the Xyngular Parties have committed perjury and made numerous misrepresentations during discovery and motion practice. Schenkel maintains that the Xyngular Parties committed perjury during discovery when they denied that Symmetry committed tax evasion, that the Xyngular Parties sold products containing impermissible amounts of lead, and that the Xyngular Parties fraudulently relabeled expired products. Schenkel also contends that the Xyngular Parties misrepresented his employment and whistleblower status, and misrepresented that he did not disclose to Xyngular management that he was getting documents from Swan.

A party commits perjury if he "(1) gives false testimony; (2) concerning a material matter; and (3) with willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."[210] "Perjury is committed with willful intent when 'made with the specific intent of obstructing justice.'"[211] While "[i]nconsistent testimony *may* amount to perjury

---

[209] *See* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1336.3 (3d ed.) ("Rule 11 should not be used to raise issues as to the legal sufficiency of a claim or defense that more appropriately can be disposed of by a motion to dismiss, a motion for judgment on the pleadings, a motion for summary judgment, or a trial on the merits.").
[210] *United States v. Quarrell*, 310 F.3d 664, 682 (10th Cir. 2002).
[211] *Radecki v. GlaxoSmithKline*, 375 F. App'x 46, 47 (2d Cir. 2010) (unpublished) (quoting *United States v. Ben-Shimon*, 249 F.3d 98, 102 (2d Cir. 2001)).

if the [witness's] intent was to give false testimony on a material matter," inconsistencies alone do not "support an inference of intent to testify falsely."[212]  Instead, inconsistent testimony ordinarily "provide[s] fertile ground for vigorous impeachment."[213]  The court examines the Xyngular Parties' four purported misrepresentations in turn.

Schenkel first argues that the Xyngular Parties committed perjury when they denied that Symmetry committed tax evasion.  Schenkel asked Symmetry in an interrogatory to "identify any agreements between You and any Symmetry employee, independent contractor, executive, board member and/or stockholder to keep confidential . . . [Symmetry's] failure to pay tax."[214]  Symmetry objected to the question and stated "that it has not committed . . . the alleged improper act[] . . . and that it is unaware of any responsive agreements."[215]  In the same set of interrogatories, Schenkel also asked Symmetry to "identify each instance where You failed to pay, remit or properly file the appropriate tax return to any foreign state, federal, state and local government."[216]  Symmetry objected because the question "calls for legal conclusions that would require Symmetry to ascertain and opine on the tax laws of all jurisdictions in which it does business."[217]  Symmetry then stated that "it is not aware of any foreign state, federal, state, or local taxes that have not been paid."[218]

Schenkel argues that Symmetry's responses constitute perjury because Kole, who verified Symmetry's responses, testified in his deposition that "there was a period early in [Symmetry] where there were amounts designated as sales tax on orders to the distributor that were charged to the distributor that registrations to several states, many states, were not

---

[212] *Montaño v. City of Chicago*, 535 F.3d 558, 566 (7th Cir. 2008).
[213] *Id.* at 564.
[214] Symmetry Corporation's Objections and Responses to First Set of Interrogatories (Dkt. 289, Ex. 8), at 9.
[215] *Id.* at 10.
[216] *Id.* at 11.
[217] *Id.*
[218] *Id.*

undertaken and, therefore, not paid."[219] Revak similarly testified that Symmetry was "collecting some sales taxes in states that we weren't registered in, and we weren't sure whether or not we needed to pay those taxes in those states. And so yea, there was a period of time that we collected those taxes in some states where we weren't registered."[220] The Xyngular Parties argue that Schenkel overlooks that there must first be a legal *obligation* to remit taxes before there can be a *failure* to remit taxes. And in states where Symmetry believed it had an obligation to remit taxes it did so.

Regardless of whether Symmetry had an obligation to remit taxes in states where it did not remit—an issue that goes to the merits of Schenkel's substantive claims that the court does not reach here—any inconsistencies between Symmetry's responses to Schenkel's interrogatories and the testimony of Kole and Revak do not rise to the level of perjury. Kole has not admitted to answering Schenkel's interrogatories falsely, and Schenkel has presented no evidence that Kole willfully intended to lie under oath. That there may be some discrepancies is not surprising considering the complexity of the legal issues underlying tax liability. But these discrepancies do not support a finding of perjury based on the record submitted—they instead bear on the witnesses' credibility, and may provide grounds for impeachment at trial. Symmetry's responses and the transcripts of Kole's and Revak's testimony alone do not demonstrate that Symmetry willfully intended to lie under oath.

Second, Schenkel asserts that the Xyngular Parties committed perjury when they denied selling any products containing impermissible amounts of lead. Schenkel alleged in his Second Amended Counterclaim and Third-Party Complaint that he was

> informed that Symmetry had been notified that numerous products it was
> selling, including a multivitamin for children, were unsafe because they

---

[219] Steve Kole Depo. (Dkt. 289, Ex. 11), at 260:24–261:4.
[220] Rudy Revak Depo. (Dkt. 289, Ex. 7), at 145:6–11.

contained lead and were potentially harmful to the public. Symmetry, however, concealed this fact from their customers and distributors and was continuing to sell the products without any warning.

The Xyngular Parties denied this allegation in their Answer "for lack of information" and "expressly den[ied] that Symmetry is or was selling unsafe products or products that are potentially harmful to the public."[221] Schenkel later asked Symmetry in an interrogatory to "identify any agreements between You and any Symmetry employee, independent contractor, executive, board member and/or stockholder to keep confidential . . . [Symmetry's] failure to disclose the existence [of] lead or other toxic substances (as defined by California state law) in Symmetry's products."[222] Symmetry objected to the interrogatory and stated "that it has not committed . . . the alleged improper act[] . . . and that it is unaware of any responsive agreements."[223]

Schenkel maintains that the Xyngular Parties committed perjury by denying that Symmetry was selling unsafe products and denying that they failed to disclose the existence of lead in Symmetry's products. In support, Schenkel notes that Symmetry was sued in late 2010 for distributing products containing lead without warnings required by California law.[224] And in October 2012, Symmetry settled that lawsuit by entering into a Consent Judgment and agreeing to pay thousands of dollars in fines.[225] But the Consent Judgment explicitly states that "[n]othing in this Consent Judgment shall constitute or be construed as an admission by any of the Parties . . . of any fact, conclusion of law, issue of law, violation of law, fault, wrongdoing, or liability."[226] The Consent Judgment also states, "nor shall this Consent Judgment be offered or admitted as

---

[221] Third-Party Defendants' Answer to Marc Schenkel's Second Amended Counterclaim and Third-Party Complaint (Dkt. 129), ¶ 84.
[222] Symmetry Corporation's Objections and Responses to First Set of Interrogatories (Dkt. 289, Ex. 8), at 9.
[223] *Id.* at 10.
[224] *See* Consent Judgment, *Environmental Research Center v. Symmetry Corp.* (Dkt. 289, Ex. 14), at 2.
[225] *See id.* at 5.
[226] *Id.* at 3.

evidence in any administrative or judicial proceeding or litigation in any court."[227]  In short, the

court in that case did not determine that Symmetry failed to disclose the existence of certain

levels of lead in their products in violation of California law.

What's more, Symmetry admitted that it was sued in response to an interrogatory in the

same set that Schenkel now argues the Xyngular Parties committed perjury in answering.

Symmetry stated:

> [A] lawsuit was brought against it . . . regarding the alleged lead content of its
> products.  Some of Symmetry's products were determined to contain
> ingredients containing a lead content beyond California's legal limits.
> Symmetry settled this lawsuit with a small monetary payment and by
> providing a warning to California residents who purchase such products.[228]

Although Symmetry admitted that some of its products were found to contain an impermissible

amount of lead, that admission is not necessarily inconsistent with Symmetry's denial that it was

selling unsafe products—conceivably, a product may contain lead at levels that does not render it

unsafe.  Nor is Symmetry's admission inconsistent with its denial that it failed to disclose the

existence of lead.  Whether Symmetry's products contained lead is distinct from whether

Symmetry failed to disclose that its products contained lead.  Even if there are inconsistencies,

however, Schenkel has presented no evidence that the Xyngular Parties—or Symmetry, in

particular—willfully intended to provide false testimony.  At most, any inconsistencies may

provide Schenkel with "fertile ground[s] for vigorous impeachment" at trial.[229]

Third, Schenkel contends that the Xyngular Parties committed perjury when they denied

committing any acts of fraud, yet failed to disclose that they fraudulently relabeled and sold

expired products.  Schenkel submits Swan's deposition testimony that he saw an employee

---

[227] *Id.*
[228] Symmetry Corporation's Objections and Responses to First Set of Interrogatories (Dkt. 308, Ex. 12), at 13.
[229] *Montaño*, 535 F.3d at 564.

relabeling expired products.[230]  Again, however, Schenkel fails to provide any evidence that the Xyngular Parties acted with a willful intent to lie.

Finally, Schenkel argues that the Xyngular Parties have made misrepresentations to the court during motion practice.  Schenkel asserts that the Xyngular Parties misrepresented that he and Swan were not Xyngular employees and thus do not qualify as whistleblowers.  The parties present conflicting testimony on this issue.  For example, Revak testified at his deposition that Schenkel's position as Xyngular's Interim Sales Director was an employee position.[231]  Revak also testified as Xyngular's corporate representative that Schenkel was paid as a consultant when he was Interim Sales Director.[232]  Revak's inconsistent testimony certainly bears on his credibility as a witness.  But Schenkel has again presented no evidence that Revak willfully provided false testimony under oath.  Instead, "[t]his is the sort of discrepancy that juries routinely sort out; by itself, it does not support a conclusion that [the Xyngular Parties] committed perjury."[233]  This is especially so when the testimony is drawn to a legal issue about which there can be genuine disagreement or misunderstanding.

Schenkel also argues that the Xyngular Parties misrepresented that Schenkel did not tell Xyngular management that he was receiving documents from Swan.  In their first motion for sanctions, the Xyngular Parties stated, "During the TRO Hearing, Schenkel admitted that Xyngular's directors were entirely unaware that Schenkel covertly was requesting from Swan and receiving downloaded documents from GVMS's servers."[234]  Schenkel asserts that this representation was false because Schenkel told Walker and Oliver that he was getting documents from Swan.  But Walker and Oliver were not Xyngular *directors*.  And Schenkel himself

---

[230] Ian Swan Depo. (Dkt. 289, Ex. 13), at 215:10–216:25.
[231] *See* Rudy Revak Depo. (Dkt. 289, Ex. 7), at 235:19 – 236:4.
[232] *See* Xyngular Rule 30(b)(6) Depo. (Dkt. 308, Ex. 4), at 95:14–23.
[233] *Montaño*, 535 F.3d at 565.
[234] Dkt. 52 at x.

testified that he never told Revak, Kole, or Julich that he was receiving documents from Swan.[235] Most importantly, though, Schenkel has not produced any evidence that the Xyngular Parties acted with a willful intent to lie.

In sum, the current factual disputes and undeveloped record leave Schenkel unable to carry his burden to prove that the Xyngular Parties made willfully false statements during discovery or motion practice. For example, the court cannot determine that the Xyngular Parties made willfully false statements or misrepresentations related to tax evasion or products containing lead without first determining whether the Xyngular Parties evaded taxes or sold products containing lead.

Schenkel points out that there is conflicting evidence in the record and that the Xyngular Parties have denied the existence of currently unproven facts. But this comes as no surprise. Litigants often deny liability or the existence of certain facts that are later proved to be true at trial. The very purpose of a lawsuit is to resolve factual disputes and determine liability or the lack thereof. The existence of contradictory evidence alone is not enough to show that the Xyngular Parties intentionally lied or misled. At this point, Schenkel has failed to prove by clear and convincing evidence or by any lesser standard that the Xyngular Parties willfully made false statements or misrepresentations that demonstrate bad faith, willfulness, or fault.

### C. Spoliation

Schenkel next maintains that the Xyngular Parties altered and spoliated documents before and after this litigation began, and then committed perjury when they denied doing so during discovery.

Spoliation is the intentional destruction or significant alteration of evidence that is

---

[235] TRO Hearing Tr. (Dkt. 139), at 92:3–11.

presumably unfavorable to the offending party,[236] "or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."[237]  Spoliation sanctions are appropriate when the offending party had "a duty to preserve evidence because it knew, or should have known, that litigation was imminent," and "the adverse party was prejudiced by the destruction of evidence."[238]  Schenkel asserts that the Xyngular Parties committed spoliation in five ways.  The court examines each asserted basis for sanctions in turn.

First, Schenkel contends that the Xyngular Parties gave him altered Board meeting minutes in fall 2012 after he asked to review Xyngular's books and records.  He urges the court to compare the differences between the finalized meeting minutes Xyngular gave him in fall 2012 and the minutes he obtained from Swan.  Xyngular submits evidence that, starting in September 2011, the Board members used notes from Board meetings to prepare and finalize minutes, and that the company prepared several drafts before finalizing the signed minutes.[239]

The minutes Xyngular provided to Schenkel are the finalized, signed meetings minutes; the minutes Swan provided are unsigned drafts that remained on the GVMS server.  The differences between the draft and finalized minutes do not prove that Xyngular intentionally and significantly altered evidence.  They instead show that Xyngular had a practice before this litigation began of creating multiple drafts before finalizing the minutes.  Even so, Schenkel has not been prejudiced by Xyngular's decision to not give him the draft minutes: the multiple drafts have been produced in discovery, meaning the information in each draft is available to him.

---

[236] *Moreno v. Taos Cty. Bd. of Comm'rs*, 587 F. App'x 442, 444 (10th Cir. 2014) (unpublished) (citation omitted); *Philips Elecs. N. Am. Corp. v. BC Technical*, 773 F. Supp. 2d 1149, 1194–95 (D. Utah 2011).
[237] *Philips Elecs.*, 773 F. Supp. 2d at 1194–95 (citation omitted) (internal quotation marks omitted).
[238] *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009) (citation omitted) (internal quotation marks omitted); *see also Philips Elecs.*, 773 F. Supp. 2d at 1195 ("[L]itigants have a duty to preserve documents or materials—including electronic documents and materials—that may be relevant to ongoing and potential future litigation.  In most cases, the duty to preserve is triggered by the filing of a lawsuit, but that duty may arise even before a lawsuit is filed if a party has notice that future litigation is likely.").
[239] *See* Jennine Blackmon-Powell Depo. (Dkt. 308, Ex. 20), at 33:1–36:21.

Second, Schenkel claims that the Xyngular Parties spoliated evidence when Kole instructed Graser to delete any reference to stock appreciation rights from a financial report that Graser was preparing for Schenkel in September 2012. Schenkel offers little context besides a portion of an email exchange between Kole and Graser. The exchange reflects that Xyngular was preparing a report for Schenkel before litigation began and was considering what information to include. Schenkel offers no evidence that the Xyngular Parties permanently deleted the information, failed to preserve it, or otherwise withheld it during this lawsuit. Without any other context or supporting evidence, the court is unable to find that Kole's decision to exclude information about stock appreciation rights in a report amounts to intentional destruction or significant alteration of evidence.

Third, Schenkel submits Swan's testimony that Julich directed Mali Sonnier, an employee working under Julich's direction, to shred "a lot" of unspecified documents over the course of about two days. But Sonnier testifies that she is "certain that I never spent two days shredding documents."[240] And that "[n]obody ever asked or told me to shred or otherwise destroy evidence or potential evidence."[241] Other Xyngular employees similarly testified that they never saw anyone destroy evidence and that no one asked them to destroy evidence.[242] Schenkel has not shown that Sonnier intentionally destroyed evidence.

Fourth, Schenkel contends that Sonnier also deleted an electronic document related to Swan's employment status and that Julich's husband, Michael Wade, "wiped" and reformatted Kole's computer. To be sure, Sonnier testified that she deleted a file concerning Swan's employment status from an electronic scan folder on her computer to ensure that the sensitive

---

[240] Decl. of Mali Sonnier (Dkt. 243), ¶ 6.
[241] *Id.* ¶ 8.
[242] *See, e.g.*, Siew-Mae Soo Depo. (Dkt. 308, Ex. 10), at 87:17–24; Jennine Blackmon-Powell Depo. (Dkt. 308, Ex. 20), at 44:2–4; Maia Lizarraga Depo. (Dkt. 308, Ex. 21), at 110:6–13.

document was not accessible to passersby.[243]  But Sonnier did not permanently delete the

document—it remained on Alytis's server.[244]  And although Swan testified that Wade told him

he was going to wipe and "burn" Kole's "computer down to the metal,"[245] Wade testified that he

was asked to repair Kole's computer, and, in doing so, he stored all of Kole's documents on

Symmetry's server.[246]  Schenkel has not shown that Wade permanently deleted documents from

Kole's computer.

Lastly, Schenkel asserts that the Xyngular Parties committed spolitation when they

allegedly erased his name from an IRS Form listing the name of each Xyngular shareholder.

Xyngular submitted the Form, titled "Election by a Small Business Corporation," to the IRS in

October 2009.  Kole signed the Form on behalf of Xyngular on October 23, 2009.  Like the share

distribution that Xyngular's Board approved at the October 2009 meeting, the Form shows that

Revak is entitled to 5,100 shares, that Julich and Kole are each entitled to 1,000 shares, and that

Swan is entitled to 200 shares.  Although Schenkel's name appears to be faintly written on the

Form, the Form was a true and correct statement when Xyngular submitted it to the IRS.  As

discussed, Schenkel did not officially become a Xyngular shareholder until Kole issued Schenkel

his stock certificate in early 2011 and backdated the effective date of his shares to January 1,

2010.  Until then, it was merely understood that Xyngular would issue Schenkel his 10% interest

in the company once he was no longer obligated to Xango.

The court concludes that Schenkel has not proved by clear and convincing evidence that

the Xyngular Parties altered documents or otherwise committed spoliation.  It follows that

Schenkel has failed to show the Xyngular Parties committed perjury when they denied doing so.

---

[243] Decl. of Mali Sonnier (Dkt. 243), ¶ 9.
[244] *Id.*
[245] Ian Swan Depo. (Dkt. 308, Ex. 19), at 335:10–22.
[246] Decl. of Michael Wade (Dkt. 244), ¶¶ 6–7.

### D. Summary

The purpose of the sanctions-related proceedings was to ensure the integrity of these proceedings as this lawsuit moved forward to summary judgment and possibly trial. Schenkel argues that the Xyngular Parties engaged in pervasive misconduct that casts doubt on the veracity of some of the evidence currently in the record.

First, Schenkel claims that the Xyngular Parties filed this lawsuit in bad faith. The gist of Schenkel's argument is that the overwhelming evidence in the record supports his position on Xyngular's claims. While Schenkel may press this argument further at summary judgment and at trial, he has failed to show that the Xyngular Parties pled their claims without any evidentiary support and in bad faith.

Second, Schenkel argues that the Xyngular Parties committed perjury in their discovery responses and during motion practice. In doing so, Schenkel relies on disputed facts and contradictory testimony by witnesses. These discrepancies unquestionably bear on the credibility of the witnesses. But they do not provide a sufficient basis to find that the Xyngular Parties willfully lied while under oath.

Third, Schenkel asserts that the Xyngular Parties altered documents and spoliated evidence before and during this litigation, and then committed perjury when they denied doing so. After studying the evidence put forward by the parties and the testimony of the witnesses, the court is unable to conclude that the Xyngular Parties intentionally destroyed or significantly altered any evidence.

Schenkel has failed to prove at this stage by clear and convincing evidence that the Xyngular Parties engaged in sanctionable misconduct. Schenkel's Motion is DENIED WITHOUT PREJUDICE.

## II.     The Xyngular Parties' Motion for Dispositive Sanctions

The court next turns to the Xyngular Parties' motion for terminating sanctions against Schenkel.  The Xyngular Parties argue that Schenkel committed egregious, sanctionable misconduct when he encouraged Swan to remove documents from GVMS's servers and then collected, reviewed, and used those documents in support of his claims in this case.  The Xyngular Parties urge the court to exercise its inherent powers to sanction Schenkel by dismissing his claims with prejudice and entering default against him on Xyngular's affirmative claims.

The court first examines whether Schenkel engaged in sanctionable misconduct when he reviewed documents on Swan's laptop, collected copies of those documents, and then used those documents in this lawsuit.  Concluding that Schenkel engaged in sanctionable misconduct, the court then discusses what sanctions are appropriate.  As explained below, the court concludes that dismissing Schenkel's claims is an appropriate sanction, but that entering default against him on Xyngular's claims is not.

### A.  Sanctionable Misconduct

As a threshold matter, the court must determine whether Schenkel engaged in sanctionable misconduct.  The court has inherent powers to enter sanctions, including dismissal, against a party who acts willfully, in bad faith, or with some fault,[247] so long as the party seeking sanctions makes that showing by clear and convincing evidence.[248]

Here, the Xyngular Parties maintain that Schenkel engaged in bad faith misconduct when he requested information and documentation from Swan, reviewed documents on Swan's laptop, collected copies of those documents, and then used those documents in this case.

---

[247] *Chavez v. City of Albuquerque*, 402 F.3d 1039, 1044 (10th Cir. 2005).
[248] *See, e.g.*, *Shepherd v. Am. Broad. Co.*, 62 F.3d 1469, 1476–78 (D.C. Cir. 1995).

As explained above, Schenkel approached Swan sometime between mid-2010 and mid-2011 about Xyngular's purportedly illegal conduct. Schenkel and Swan had many conversations for over a year. During their conversations, Schenkel asked Swan for information and documentation that would prove not only how many shares of Xyngular stock Schenkel owned, but also that he was not participating in the allegedly illegal acts at Xyngular. Swan on several occasions then showed Schenkel documents on his laptop that he had collected over time. It is unclear which documents Schenkel viewed on Swan's laptop.

Schenkel then sent Xyngular two demand letters on September 1, 2011, after he had already viewed documents on Swan's laptop. In his letters, Schenkel asked that Xyngular's Board of Directors investigate and pursue claims against Revak, Julich, and Kole for various misconduct. And in both letters, Schenkel stated that he would initiate legal proceedings if the matters were not addressed internally. Schenkel admits that he intended to initiate litigation when he sent the demand letters. His admission is supported by his position in discovery in this case that more than 125 documents created prior to the filing of this lawsuit—some dating back to 2011—are privileged materials prepared in anticipation of litigation.

 Beginning in October 2011, Schenkel switched from merely reviewing documents to collecting copies of documents from Swan. Swan provided the documents after Schenkel requested any information or documentation showing how many shares he owned in Xyngular and that he was not participating in any of the allegedly illegal conduct at Xyngular. In all, Schenkel collected over three hundred documents from Swan.

The documents Schenkel obtained include, among others, balance sheets, budgets, Board meeting minutes, employment agreements, product ingredient lists, and documents containing employees' personal information. Without the benefit of discovery motion practice, the court

cannot determine which documents are relevant to the issues in this case or would have been produced in litigation. Nor can the court determine which documents should be subject to a protective order.

The documents Schenkel obtained belong to Xyngular, GVMS, Symmetry, and other companies whose documents reside on GVMS's servers. As an IT consultant for GVMS, Swan had the necessary authorization and password to access the servers on which the business records and documents reside. But there is no evidence that Swan had authority to remove the documents, possess them, or give them to third parties. And there is likewise no evidence that Schenkel had authorization or a password to access GVMS's servers.

Schenkel collected documents from Swan for over a year. There is no evidence before the court that Schenkel continued to collect documents after this litigation began in September 2012.

Although Schenkel later disclosed in his initial disclosures the identity and quantity of the documents he obtained from Swan, the Xyngular Parties first learned about any specific documents Schenkel obtained when he attached several of them to his Answer, Counterclaim, and Third-Party Complaint, and when he attached documents to support his Motion for a Temporary Restraining Order.

The Xyngular Parties maintain that Schenkel's conduct exhibits bad faith. But Schenkel contends that the court cannot sanction him for three reasons. First, he argues that his purported misconduct occurred entirely before this litigation began and that the court lacks any power to sanction prelitigation bad faith conduct. Second, he argues that he was entitled to the documents under Delaware law as a Xyngular shareholder. And third, he argues that even if the court has authority to sanction his prelitigation conduct and even if he was not entitled to the documents as

a shareholder, he did not act in bad faith. The court addresses each argument in turn.

## 1. Prelitigation Conduct

Schenkel argues that sanctions against him are inappropriate because his purported misconduct occurred entirely before this litigation began. Schenkel relies primarily on the Tenth Circuit Court of Appeals' decision in *Towerridge, Inc. v. T.A.O., Inc.*[249] for the proposition that courts may not use their inherent powers to sanction any prelitigation bad faith conduct.

In *Towerridge*, the Court of Appeals distinguished between three types of bad faith conduct: (1) "bad faith occurring during the course of litigation that is abusive of the litigation process," (2) "bad faith in bringing an action or in causing an action to be brought," and (3) "bad faith in the acts giving rise to the substantive claim."[250] While courts may use their inherent powers to sanction the first two types of bad faith conduct, courts may not sanction the third.[251]

Pointing to the third type of bad faith conduct articulated in *Towerridge*, Schenkel argues that the court may not consider any of his prelitigation activities in determining whether sanctions against him are appropriate. The court disagrees with Schenkel's reading of *Towerridge*. To be sure, the Court of Appeals stated that it is "unlikely" that courts may sanction "bad-faith conduct not occurring during the course of the litigation itself."[252] But the court made clear that it was not deciding whether a court may consider any prelitigation bad faith conduct in evaluating whether to impose sanctions where litigation bad faith conduct also exists.[253] Rather, the court held only that courts may not sanction "solely" prelitigation bad faith conduct, where the prelitigation bad faith conduct at issue gave rise to the substantive claims in the case.[254]

---

[249] 111 F.3d 758 (10th Cir. 1997).
[250] *Id.* at 768.
[251] *Id.*
[252] *Id.* at 766.
[253] *Id.* at 767 n.6.
[254] *Id.* at 765–66, 767 n.6, 768; *see also Morganroth & Morganroth v. DeLorean*, 213 F.3d 1301, 1317 (10th Cir. 2000) (reversing the district court's award of attorney fees as a sanction pursuant to the district court's inherent

The court does not here rely solely on Schenkel's prelitigation activity in finding that he engaged in bad faith misconduct. The court instead relies on his prelitigation request, review, and collection of documents in anticipation of litigation, and his later introduction of those materials in this litigation to support his claims. Also, Schenkel's prelitigation request, review, and collection of documents do not form the basis for the substantive claims in this lawsuit. Instead, the underlying claims concern Schenkel's ownership interest in Xyngular and the other founders' allegedly illegal acts. *Towerridge* does not preclude the court from imposing sanctions against Schenkel for his prelitigation request, review, and collection of documents and later use of those materials as evidence in this litigation.

Under *Towerridge*, a court cannot, for example, sanction a litigant for breaching a contract in bad faith.[255] A party injured by a breach of contract may vindicate her contract rights through a substantive claim. But bad faith conduct that abuses the judicial process undermines the integrity of the litigation. This includes prelitigation bad faith conduct that directly affects an ongoing lawsuit. If it were otherwise, parties would have an incentive to engage in misconduct in preparation for lawsuits. And the only recourse for an injured party would be to bring a substantive claim in place of a motion for sanctions, while the adverse party continues to reap the benefits of his misconduct at trial.

Here, for instance, the Xyngular Parties would be forced to bring a claim for conversion. The court would then entertain a lawsuit for conversion while Schenkel continues to use improperly obtained documents to pursue his claims in this proceeding. This scenario would

---

powers because the award was impermissibly "based on the underlying previous conduct which gave rise to the cause of action" in the instant case), *overruled on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011); *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 391 (7th Cir. 2002) (explaining that federal courts should use their inherent powers to punish misconduct "occurring in the litigation itself, not in the events giving rise to the litigation (for then the punishment would be a product of substantive law—designed, for example, to deter breaches of contract)").

[255] *See Towerridge*, 111 F.3d at 765, 768.

constitute an abuse of the judicial process by rewarding improper behavior and making the court complicit in the misconduct, while also creating perverse incentives for future litigants to brush aside the rules governing discovery.[256]

Schenkel's approach would deprive the court of any power to sanction a party whose improper prelitigation conduct directly affects the integrity of an ongoing lawsuit. His rule would allow a party to improperly obtain evidence, file a lawsuit the next day, and then rely on the ill-gotten evidence at trial. And while a party could face terminating sanctions in appropriate cases for prelitigation destruction or alteration of evidence (as Schenkel argues in his motion for terminating sanctions against the Xyngular Parties), one who steals evidence from an adversary for use in a subsequent proceeding would be immune from sanction by the court. Schenkel's rule would provide an incentive to lie, cheat, and steal in preparation for litigation. It would also hinder the court's longstanding power and obligation to preserve the integrity of the judicial process.[257] The court declines to adopt Schenkel's rigid approach. The court instead concludes that it may use its inherent powers to sanction a party who circumvents the discovery process and the rules of engagement employed by the federal courts by improperly obtaining evidence before litigation and then attempting to use that evidence in litigation.[258]

---

[256] *See Brado v. Vocera Commc'ns, Inc.*, 14 F. Supp. 3d 1316, 1321 (N.D. Cal. 2014) ("Allowing the document [improperly] taken by the plaintiff for his or her use in litigation against defendant would reward the plaintiff to engage in wrongful conduct and poses a moral hazard with perverse incentives."); *Fayemi v. Hambrecht & Quist, Inc.*, 174 F.R.D. 319, 324 (S.D.N.Y. 1997) ("Pursuant to this inherent authority, a court must be able to sanction a party that seeks to introduce improperly obtained evidence; otherwise the court, by allowing the wrongdoer to utilize the information in litigation before it, becomes complicit in the misconduct.").

[257] *See Philips Elecs. N. Am. Corp. v. BC Technical*, 773 F. Supp. 2d 1149, 1196 (D. Utah 2011) (stating that courts have inherent power to impose sanctions that "redress conduct that abuses the judicial process").

[258] *See Fayemi*, 174 F.R.D. at 324 (holding that the court "has the inherent authority to sanction a party who attempts to use in litigation material improperly obtained outside the discovery process"); *id.* at 325 ("A court may . . . exercise its inherent equitable powers to sanction a party that seeks to use in litigation evidence that was wrongfully obtained."); *In re Shell Oil Refinery*, 143 F.R.D. 105, 108 (E.D. La. 1992) (holding that courts may sanction parties who obtain documents outside the discovery process pursuant to their "authority to remedy litigation practices that threaten judicial integrity and the adversary processes"). Also, as discussed earlier, the Tenth Circuit Court of Appeals has affirmed sanctions based on spoliation, which is prelitigation conduct that eventually affects an ongoing lawsuit. *See Moreno v. Taos Cty. Bd. of Comm'rs*, 587 F. App'x 442, 444 (10th Cir. 2014) (unpublished)

### 2.  Schenkel's Entitlement to the Documents under Delaware Law

Schenkel next argues that he did not commit sanctionable misconduct because he and Swan were entitled to possess the documents on GVMS's local area network based on their status as Xygnular shareholders and co-owners.

Under Delaware law, a shareholder "shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose, and to make copies and extracts from . . . [t]he corporation's stock ledger, a list of its stockholders, and its other books and records."[259]  "If the corporation, or an officer or agent thereof, refuses to permit an inspection . . . or does not reply to the demand within 5 business days after the demand has been made, the stockholder may apply to the Court of Chancery for an order to compel such inspection."[260]

The record is clear that Schenkel did not obtain the documents pursuant to a formal written demand to inspect Xyngular's books and records.  Although there is evidence to suggest that Schenkel made a demand to inspect Xyngular's books and records around the time this lawsuit was filed in September 2012, he requested, reviewed, and collected documents from Swan well before then.  Schenkel argues that this is of no consequence and that he is exempt from the stated requirements because Xyngular is a closely held corporation.  On that basis, he argues that he had full authorization to access and to use the documents unconstrained by the Delaware law identified above.  But Schenkel cites no factual or legal authority showing that

_____

("Sanctions for spoliation of evidence are appropriate when there party had a duty to preserve the evidence because it knew or should have known that litigation was imminent, and the other party was prejudiced by the destruction of the evidence." (citation omitted) (internal quotation marks omitted)); *see also Large v. Mobile Tool Int'l, Inc.*, 2008 WL 89897, at *7 (N.D. Ind. Jan. 7, 2008) ("The court has the inherent authority to sanction a party for misconduct, including prelitigation spoliation, in order to protect the integrity of the judicial system and prevent abuses of the discovery process." (citation omitted) (internal quotation marks omitted)).

[259] Del. Code tit. 8, § 220(b)(1).  The parties agree that Delaware law controls whether Schenkel was entitled to the documents on GVMS's servers because of his status as a Xyngular shareholder.

[260] *Id.* § 220(c).

Xyngular is in fact a closely held corporation and that he had an unfettered right to access and use the documents for any purpose as a result. Accordingly, the court declines to consider Schenkel's contention.[261]

There is no evidence that Schenkel had free range to access and use in this litigation the documents kept on GVMS's servers—including the materials he took from the server that are not obviously Xyngular documents. By collecting the documents from Swan for over a year without permission, Schenkel circumvented the legal procedures in place that provide shareholders with a process to access the books and records of a corporation, and with means to challenge a corporation's refusal to allow shareholders to conduct an inspection.

### 3. Schenkel's Willfulness, Bad Faith, and Fault

Finally, Schenkel argues that sanctions against him are not warranted because he did not act in bad faith. The court may exercise its inherent powers to sanction Schenkel only if the Xyngular Parties show by clear and convincing evidence that he acted willfully, in bad faith, or with some fault.[262] The court concludes that the Xyngular Parties have met their burden, and that Schenkel committed sanctionable misconduct by acting willfully, in bad faith, and with fault.

"[I]t is an improper litigation tactic to use a disgruntled employee to secretly obtain non-public internal business documents from an opposing party."[263] And a "court may sanction a party for wrongfully obtaining the property or confidential information of an opposing party."[264]

In *Glynn v. EDO Corp.*, for example, the court sanctioned the plaintiff, a former employee for the defendant, for obtaining from a current employee before and during the

---

[261] *See PHL Variable Ins. Co. v. Sheldon Hathaway Family Ins. Trust ex rel. Hathaway*, 819 F.3d 1283, 1290 (10th Cir. 2016) (declining to consider a party's suggestion because it "provide[d] no argument or authority to support" it).
[262] *Chavez v. City of Albuquerque*, 402 F.3d 1039, 1044 (10th Cir. 2005); *see, e.g.*, *Shepherd v. Am. Broad. Co.*, 62 F.3d 1469, 1476–78 (D.C. Cir. 1995).
[263] *Glynn v. EDO Corp.*, 2010 WL 3294347, at *5 (D. Md. Aug. 20, 2010).
[264] *Id.* at *3.

litigation non-public, internal documents and other information belonging to the defendant.[265] The court concluded that "it was inappropriate for [the plaintiff and his lawyers] to surreptitiously acquire these internal [] documents outside of the normal discovery channels."[266] It was also inappropriate for the plaintiff and his lawyers to unilaterally decide whether the documents were proprietary, confidential, or privileged, where "those decisions are best resolved through the formal discovery process."[267]

Similarly, in *Jackson v. Microsoft Corp.*,[268] the plaintiff obtained from an unknown source, and without permission, thousands of documents—many of which contained trade secret and other confidential information—from his former supervisor's computer shortly before leaving the company.[269] The plaintiff then kept the documents for ten months before turning them over to the defendant.[270] The court concluded that the plaintiff's conduct "was egregious in the extreme," and that his theft of the documents alone warranted terminating sanctions.[271]

Sanctions against Schenkel are likewise appropriate because he has undermined the legitimacy of these proceedings and skirted the discovery process. Schenkel requested and reviewed numerous, unidentified documents that were stored on GVMS's servers. He then collected over three hundred documents from Swan over the course of a year in response to his request for information and documentation concerning his "situation and [his] shares at

---

[265] *Id.* at *1–5.
[266] *Id.* at *5.
[267] *Id.*
[268] 211 F.R.D. 423 (W.D. Wash. 2002), *aff'd*, 78 F. App'x 588 (9th Cir. 2003) (unpublished).
[269] *Id.* at 425–32.
[270] *Id.*
[271] *Id.* at 431; *see also Rhodes v. LaSalle Bank, N.A.*, 2005 WL 281221, at *3 (N.D. Ill. Feb. 1, 2005) (finding that plaintiff acted in bad faith when she stole proprietary documents—which were "directly relevant to her claim for constructive discharge"—from defendant before initiating litigation); *Fayemi v. Hambrecht & Quist, Inc.*, 174 F.R.D. 319, 322–26 (S.D.N.Y. 1997) (sanctioning plaintiff for attempting to use confidential documents in litigation that he obtained by entering his former supervisor's office without permission two days after his termination).

Xyngular."[272]  There is no evidence that Swan or Schenkel had authorization to access, review, or possess these documents for their own purposes.

Moreover, the documents Schenkel collected from Swan belonged not only to companies with which Schenkel was not associated, but also to his potential adversaries in his anticipated litigation.  The parties dispute whether some or all of the documents might otherwise have been produced during discovery, but "those decisions are best resolved through the formal discovery process,"[273] a process that Schenkel usurped for his own purposes.  As *Glynn* and *Jackson* show, it is improper to surreptitiously acquire an opposing party's property outside of the discovery process.

Further, Schenkel admits he was anticipating litigation against the Xyngular Parties while he was collecting the documents.  This is supported by his contemporaneous demand letters and claims to work product privilege for over 125 documents created between 2011 and September 2012.  Schenkel then used the documents collected from GVMS's servers in this litigation to support his affirmative claims, defenses, and application for a temporary restraining order.  Schenkel improperly circumvented the discovery process and contaminated this proceeding when he submitted and urged the court to act in reliance on the improperly obtained documents.

Parties anticipating litigation may not engage in self-help by improperly gathering a potential adversary's property.  This conduct is an affront to the established rules of engagement and fair play in lawsuits.  It amounts to an end-run around the Federal Rules of Civil Procedure, including the rules governing discovery and the orderly exchange of information relevant to disputes presented for resolution in our courts.  This conduct undermines the confidence of both litigants and the public in the fairness of judicial proceedings.  Schenkel's actions demonstrate

---

[272] TRO Hearing Tr. (Dkt. 139), at 85:20–21.
[273] *Glynn*, 2010 WL 3294347, at *5.

willfulness, bad faith, and fault that abuses the judicial process and impugns the integrity of these proceedings. Serious sanctions are warranted.

Schenkel relies primarily on two cases to support his argument that he has not committed any sanctionable misconduct: *Oracle America, Inc. v. Innovative Technology Distributors*[274] and *Brado v. Vocera Communications, Inc.*[275] Both cases are distinguishable.

In *Oracle*, the court declined to disqualify the defendant's counsel for using the plaintiff's confidential documents to draft a complaint, where the plaintiff's employees voluntarily sent the documents to the defendant's employees "long before" the lawsuit began.[276]

Similarly, the court in *Brado* allowed the plaintiffs to use relevant documents that a former employee of the defendant gave to an investigator hired by the plaintiffs' lawyers.[277] The court did so because the plaintiffs' lawyers did not commit any unethical conduct, and the plaintiffs did not procure or cause the former employee to misappropriate the documents.[278] After the plaintiffs' investigator reviewed the documents and questioned their confidentiality, their lawyers hired separate counsel to sequester the documents before the plaintiffs' lawyers could review them.[279] The plaintiffs then asked the court to conduct an in camera review of the documents and to impose a protective order governing the use of the documents.[280]

In comparing *Oracle* and *Brado* to the facts of this case, Schenkel attempts to paint himself as an innocent, passive recipient of documents. But Schenkel did not unwittingly receive documents long before the prospect of litigation arose. Rather, he specifically and intentionally asked Swan to provide him information and documentation confirming his ownership interest in

---

[274] 2011 WL 2940313 (N.D. Cal. July 20, 2011).
[275] 14 F. Supp. 3d 1316 (N.D. Cal. 2014).
[276] *Oracle*, 2011 WL 2940313, at *5–6.
[277] *Brado*, 14 F. Supp. 3d at 1318–23.
[278] *Id.* at 1321–23.
[279] *Id.* at 1318.
[280] *Id.*

Xyngular.  Then, instead of meaningfully informing Xyngular that Swan was giving him documents, Schenkel accepted, reviewed, and gave to his lawyers over three hundred documents belonging to Xyngular and other entities with which he was not associated.  And he did so all while threatening—and eventually using the documents in—litigation against Xyngular.

Schenkel also argues that, far from acting improperly, he gathered documents as a whistleblower with the intent to report illegal conduct to government authorities.  But even if he engaged in protected whistleblowing activity, an issue the court does not here address, he was also acting as a potential litigant.  Schenkel claims that he reported to governmental authority numerous illegal acts committed by the Xyngular Parties.  But Schenkel also asked Swan for information and documentation that would support his claim to 2,600 Xyngular shares.  The information and documentation related to Xyngular shares is distinct from any information that Schenkel sought to blow the whistle.  And he continued to collect documents, which he admits are relevant to the pending claims in this case, even after he stopped providing documents to the FBI in February 2012.  The court finds that Schenkel collected documents that he never intended to provide to governmental authorities for whistleblowing.

Schenkel's purported whistleblower activity does not preclude a finding of willfulness, bad faith, or fault.  Even assuming Schenkel was motivated in part by legitimate whistleblowing intent, his willful and improper acquisition of documents to support his claims in anticipated litigation is not immunized by separate whistleblowing activity.  Moreover, it is highly doubtful that a whistleblower is free to take documents from his current or former employer without permission.  Federal courts have been leery to protect whistleblowers who improperly acquired their employers' property.[281]  And even if Schenkel acted solely as a sincere whistleblower, and

---

[281] *See, e.g.*, *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 727 (6th Cir. 2008) ("Although employees deserve protection when they make reasonable attempts to preserve evidence of illegal employment practices, including

not as a potential litigant, he likely would not have enjoyed an unfettered ability to collect documents from GVMS's server.  Schenkel's collection of over three hundred documents—many of which contain sensitive business and personal information—was improper for a whistleblower, let alone for a potential litigant.  His whistleblower activity, if any, does not shield his bad faith conduct.

The court finds by clear and convincing evidence that Schenkel acted willfully, in bad faith, and with fault in a way that abuses the judicial process and undermines the legitimacy of these proceedings.  Accordingly, Schenkel has committed sanctionable misconduct.

## B. Appropriate Sanctions under the *Ehrenhaus* Factors

The court now turns to the five so-called *Ehrenhaus* factors to determine the appropriate sanction to impose against Schenkel.  The factors are: "(1) the degree of actual prejudice to the opposing party, (2) the degree of interference with the judicial process, (3) the litigant's culpability, (4) whether the litigant was warned in advance that dismissal was a likely sanction, and (5) whether a lesser sanction would be effective."[282]  "These factors do not constitute a rigid

---

discrimination and retaliation, 'we are loathe [sic] to provide employees an incentive to rifle through confidential files looking for evidence that might come in handy in later litigation.'" (quoting *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996))); *JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 697, 702 (E.D. Va. 2007) ("By no means can the [California policy favoring whistleblowing] fairly be said to authorize disgruntled employees to pilfer a wheelbarrow full of an employer's proprietary documents in violation of their contract merely because it might help them blow the whistle on an employer's violations of law, real or imagined. Endorsing such theft or conversion would effectively invalidate most confidentiality agreements, as employees would feel free to haul away proprietary documents, computers, or hard drives, in contravention of their confidentiality agreements, knowing they could later argue they needed the documents to pursue suits against employers under a variety of statutes . . . ."); *Watkins v. Ford Motor Co.*, 2005 WL 3448036, at *7 (S.D. Ohio Dec. 15, 2005) ([I]f the Court were to adopt plaintiff's argument that [copying and disclosing an employer's confidential documents] is protected activity, 'plaintiffs everywhere would be entitled, under the umbrella of protected activity, to steal company information and, so long as they give the information to their lawyer, not only be able to avoid disciplinary action by their employer, but also be empowered to successfully maintain a claim against their employer if adverse action is taken for the misconduct .'").  In addition, the Securities and Exchange Commission's whistleblower program prevents whistleblowers from submitting information to the Commission that was obtained "by a means or in a manner that is determined by a United States court to violate applicable Federal or state criminal law."  17 C.F.R. § 240.21F-4(b)(4)(iv).
[282] *LaFleur v. Teen Help*, 342 F.3d 1145, 1151 (10th Cir. 2003) (citation omitted).

test."[283]  They instead present a "flexible framework," under which dismissal is appropriate when "'the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits.'"[284]

In evaluating these five factors, the court is mindful that any eventual sanctions should adequately punish Schenkel's misconduct, remedy the prejudice to and harm suffered by the Xyngular Parties and the judicial process, deter future litigants from engaging in this type of misconduct, and engender public trust in the integrity of the judicial proceedings.[285]

### 1. Prejudice

The court first considers "the degree of actual prejudice to the opposing party."[286] Schenkel on several occasions reviewed documents on Swan's laptop.  Schenkel then gathered over three hundred documents from Swan and attached a number of them to his pleadings and Motion for a Temporary Restraining Order.  While the Xyngular Parties still do not know which documents Schenkel reviewed but did not later collect, a small sample of the documents he

---

[283] *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992).

[284] *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1144 (10th Cir. 2007) (quoting *Ehrenhaus*, 965 F.2d at 921).

[285] *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (stating that inherent power sanctions are meant to vindicate judicial authority); *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (holding that sanctions are intended "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent"); *Lee v. Max Int'l*, 638 F.3d 1318, 1320 (10th Cir. 2011) (explaining that "district courts must have latitude to use severe sanctions for purposes of general deterrence" (citation omitted) (internal quotation marks omitted)); *Positive Software Solutions, Inc. v. New Century Mortg.*, 619 F.3d 458, 460 (5th Cir. 2010) (noting that sanctions are designed "to preserve the authority of the court" (citation omitted) (internal quotation marks omitted)); *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 390 (7th Cir. 2002) (stating that federal courts have inherent authority "to punish misconduct"); *Mark Indus., Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730, 733 (9th Cir. 1995) ("The proper use of sanctions that are within the court's inherent power is to protect the court so it may adequately dispense justice"); *Philips Elecs. N. Am. Corp. v. BC Technical*, 773 F. Supp. 2d 1149, 1196 (D. Utah 2011) (explaining that sanctions are intended to "redress conduct that abuses the judicial process," "to ensure that the judicial process is not abused," and "to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth" (citation omitted) (internal quotation marks omitted)); *Fayemi v. Hambrecht & Quist, Inc.*, 174 F.R.D. 319, 325 (S.D.N.Y. 1997) ("A court considering the appropriate sanction to impose on a party that has wrongfully obtained evidence should weigh two factors: the severity of the wrongdoing and the prejudice to the adversary."); *In re Shell Oil Refinery*, 143 F.R.D. 105, 108 (E.D. La. 1992) (stating that inherent power sanctions should "remedy litigation practices that threaten judicial integrity and the adversary processes").

[286] *LaFleur*, 342 F.3d at 1151.

collected includes a document containing budget information for GVMS, a document listing Symmetry's account payables, rough drafts of Xyngular Board meeting minutes, Revak's birth certificate, and financial projections for a company named Upper Case Living. The Xyngular Parties assert that many of the documents Schenkel obtained contain sensitive, confidential, and privileged information. Indeed, the documents he collected belong to various companies, including companies in which he held no position or interest. And some contain the individual Third-Party Defendants' personal information.

Schenkel argues that the Xyngular Parties have not been prejudiced by his conduct because some of the documents he collected are irrelevant to the claims in this lawsuit, while many others are highly relevant and would have been produced in discovery anyway. The court disagrees. Some of the admittedly irrelevant documents contain person information belonging to the individual Third-Party Defendants, as well as information relating to their other business interests. These individuals have been prejudiced by Schenkel's unauthorized possession and possible use of this information. As for the documents Schenkel contends are highly relevant to his claims, it is certainly prejudicial to collect an opposing party's critical documents without authorization and then use them in litigation to gain an unfair advantage. This is especially so when the documents are highly relevant to disputed claims.[287]

Schenkel's argument blows past the rules governing discovery and the parties' right to a neutral forum for resolving discovery disputes. Litigants do not enjoy an unobstructed right to obtain any documents they want. A party's ability to obtain discovery is restrained by the standards laid out in the Federal Rules and applicable case law applying those Rules. When discovery disputes arise, the court can use the Rules to employ a host of available remedies. For

---

[287] *See, e.g.*, *Jackson v. Microsoft Corp.*, 211 F.R.D. 423, 432 (W.D. Wash. 2002) (finding that defendant had "been prejudiced in its ability to fairly defend itself" in the litigation" because some of the "vast number of confidential documents" that plaintiff improperly obtained went "directly to the heart of [the] litigation").

example, courts can issue protective orders that protect sensitive information by limiting who can access certain documents and for what purpose. The protections and remedies found in the Rules provide the means to a structured and fair exchange of information. The Rules also provide a process that litigants can trust to protect their sensitive information and to prevent abusive conduct.

Schenkel has availed himself of these important protections in this case. As noted, when the Xyngular Parties served requests for documents, Schenkel's lawyers first reviewed responsive documents and withheld more than 125 documents on the basis that they believed them to be subject to protection as privileged work product materials. But at the same time, his surreptitious self-help deprived the Xyngular Parties of those very protections under the Rules. Schenkel did not obtain the documents pursuant to a discovery request, which would have provided the Xyngular Parties an opportunity to have legal counsel evaluate the propriety of the request and raise appropriate objections that could be resolved by a neutral judicial officer. They also had no opportunity to seek a protective order limiting access or use of the information that might be produced. The Xyngular Parties and the court are instead left with Schenkel's after-the-fact assurances that the documents he improperly reviewed and received before the lawsuit began are highly relevant to the issues in this case, not subject to any privilege, and would have been produced in discovery without objection or limitation on use. Schenkel deprived the Xyngular Parties of the important processes and protections provided by the Federal Rules.[288]

---

[288] *See, e.g.*, *Rhodes v. LaSalle Bank, N.A.*, 2005 WL 281221, at *4 (N.D. Ill. Feb. 1, 2005) (stating that the determination of whether the improperly obtained documents were relevant was not for plaintiff to decide; "[i]f she had an objection, she could have come into court and contested the matter"); *In re Shell Oil Refinery*, 143 F.R.D. at 108 ("[T]he PLC's receipt of Shell's proprietary documents in this manner was inappropriate and contrary to fair play. . . . The PLC has effectively circumvented the discovery process and prevented Shell from being able to argue against production. Had the PLC sought to obtain these documents through the discovery process, Shell would have had the opportunity to seek a protective order pursuant to the Federal Rules of Civil Procedure.").

Lastly, Schenkel's conduct has caused substantial delays in the final resolution of the substantive claims. The added time and efforts related to these sanctions proceedings have resulted in significant fees and costs.[289]

The Xyngular Parties have been meaningfully prejudiced as a result of Schenkel's misconduct.

### 2. Interference with the Judicial Process

The court next considers "the degree of interference with the judicial process."[290] Believing he had been wronged by the Xyngular Parties, Schenkel intended to come to court to vindicate his ownership claim, and possibly seek redress for what he believed were improper acts by the other founders. Before filing his lawsuit or asserting his claims (as he ultimately did as counterclaims and third-party claims), Schenkel interfered with the judicial process by circumventing the Federal Rules of Civil Procedure, including those governing discovery. While anticipating litigation, Schenkel improperly collected over three hundred documents he now says are highly relevant to this lawsuit—exactly the kinds of documents parties would seek under the discovery rules. As noted, many of those documents contain sensitive and confidential information that might not have been discoverable under the rules. But the Xyngular Parties had no opportunity to raise objections.

There exists an implicit agreement and promise that those who come to the courts to seek help resolving disputes will play by the established rules. That promise means little if the public cannot confidently expect that the disputes presented in the courts will be decided according to well-established and carefully-designed rules uniformly applied to all parties, in all lawsuits. Schenkel disregarded this basic notion. He did not play by the rules, but rather leapt over them,

---

[289] *See, e.g., Ehrenhaus*, 965 F.2d at 921 (concluding that plaintiff's misconduct "prejudiced the defendants by causing delay and mounting attorney's fees").
[290] *LaFleur*, 342 F.3d at 1151.

bypassing the judicial process. And in doing so, he undermined the Xyngular Parties'
confidence in these proceedings, and the public's confidence in the fairness of judicial
proceedings in general. These are important matters. Schenkel's conduct deprived the court of
the chance to fulfill its fundamental obligation to ensure the integrity of these proceedings. He
has significantly interfered with the judicial process.

### 3. Culpability

The third factor is "the litigant's culpability."[291] As discussed above, Schenkel's
misconduct demonstrates willfulness, bad faith, and fault. The record shows that Schenkel
approached Swan and requested information and documentation to support his claim to 2,600
Xyngular shares, that he sought and knowingly accepted documents from Swan, that he did so in
anticipation of litigation, that he used some of the documents to support his claims in this
lawsuit, and that he continued collecting documents until at least late 2012.

Coupled with Schenkel's actions are his inactions. There is no evidence that Schenkel
declined information and documents from Swan, or that he told Swan to stop removing
documents from GVMS's server. Nor is there any evidence that Schenkel made a complete or
meaningful disclosure of his improper document gathering to the Xyngular Parties until after this
lawsuit began.

The court finds that his conduct establishes that Schenkel made a calculated decision to
obtain the documents for strategic use in litigation. This shows a high level of culpability.

### 4. Advanced Warning

The next factor is "whether the litigant was warned in advance that dismissal was a likely
sanction."[292] Schenkel did not receive an advanced warning before he collected and used in this

---

[291] *Id.* at 1151.
[292] *LaFleur*, 342 F.3d at 1151.

litigation the documents from GVMS's server. The court had no opportunity to warn Schenkel, given that the court was unaware of his document collection until after the start of litigation. Nonetheless, the absence of a warning is not dispositive.[293]

### 5. Efficacy of a Lesser Sanction

Lastly, the court must determine "whether a lesser sanction would be effective."[294] The Xyngular Parties urge the court to dismiss Schenkel's claims and to enter default against him on Xyngular's affirmative claims. Schenkel maintains that he has not acted improperly and therefore warrants no sanction. He offers no argument about lesser alternative sanctions.

The court concludes that Schenkel's bad faith conduct warrants dismissal of his claims. But the court does not go so far as to enter default against Schenkel on Xyngular's claims. Instead, the court excludes from these proceedings the evidence that Schenkel obtained from Swan, and awards the Xyngular Parties their costs and fees in bringing their motions for sanctions. The court arrives at this conclusion based on an analysis of potential alternative sanctions.

### a. Dismissal

Dismissal is "an extreme sanction" and "should be used as a weapon of last, rather than first, resort."[295] And "[o]nly when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits is dismissal an appropriate sanction."[296] As stated above, in evaluating whether there is an effective yet lesser sanction than dismissal, the court considers whether the lesser sanction would remedy the harm to the Xyngular Parties and the

---

[293] *See Rogers v. Andrus Transp. Servs.*, 502 F.3d 1147, 1152 (10th Cir. 2007) (stating that "a warning is not a *sine qua non* for dismissal"); *Ehrenhaus*, 965 F.2d at 922 (explaining that although "[a] district court should ordinarily consider and address all of the [] factors before imposing dismissal as a sanction," "often some of the[] factors will take on more importance than others").

[294] *LaFleur*, 342 F.3d at 1151.

[295] *Ehrenhaus*, 965 F.2d at 920 (citing *Meade v. Grubbs*, 841 F.2d 1512, 1520 (10th Cir. 1988)).

[296] *Meade*, 841 F.2d at 1520 n.7 (citations omitted).

judicial process, whether it would deter future misconduct by Schenkel and future litigants, and whether it would appropriately punish Schenkel.[297]

A number of federal courts have considered whether to dismiss claims as a sanction for misconduct.[298] For example, the court in *Perna v. Electronic Data Systems, Corp.* dismissed the plaintiff's claim after he rifled through an opposing counsel's briefcase and photocopied documents.[299] The court concluded that the plaintiff's actions constituted the type of willful and extreme conduct that warranted dismissal.[300] Similarly, in *Jackson v. Microsoft Corp.*, the court dismissed the plaintiff's claims after he improperly collected thousands of documents from his former employer and then made several misrepresentations to the court and opposing counsel in an attempt to hide his misconduct.[301]

Other courts have determined in related cases that a lesser sanction than dismissal was more appropriate. In *Glynn v. EDO Corp.*, the court imposed monetary sanctions instead of dismissing the case because the offending parties' misconduct was limited to a "handful of . . . documents" and the documents likely would have been produced in discovery, meaning any prejudice would have been cured.[302] Other courts have arrived at similar conclusions upon finding that a lesser sanction would mitigate any prejudice.[303]

Here, Schenkel's conduct demonstrates bad faith, willfulness, and fault, and warrants dismissal of his claims. While anticipating this litigation, Schenkel asked Swan to provide

---

[297] *See Ehrenhaus*, 965 F.2d at 920–21; *Philips Elecs. N. Am. Corp. v. BC Technical*, 773 F. Supp. 2d 1149, 1213–14 (D. Utah 2011); *Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*, 133 F.R.D. 166, 170 (D. Colo. 1990).
[298] *See, e.g., Glynn v. EDO Corp.*, 2010 WL 3294347, at *6 (D. Md. Aug. 20, 2010); *Ashman v. Solectron Corp.*, 2008 WL 5071101, at *4 (N.D. Cal. Dec. 1, 2008); *Jackson v. Microsoft Corp.*, 211 F.R.D. 423, 432 (W.D. Wash. 2002); *Fayemi v. Hambrecht & Quist, Inc.*, 174 F.R.D. 319, 326 (S.D.N.Y. 1997); *Perna v. Elec. Data Sys., Corp.*, 916 F. Supp. 388, 399 (D.N.J. 1995).
[299] 916 F. Supp. at 399.
[300] *Id.*
[301] 211 F.R.D. at 432.
[302] 2010 WL 3294347, at *6.
[303] *See, e.g., Ashman*, 2008 WL 5071101, at *4; *Fayemi*, 174 F.R.D. at 326.

information and documents that would support his claim to 2,600 Xyngular shares. He received over three hundred documents from Swan over the course of a year. He began accepting and reviewing documents shortly after he sent demand letters stating his intent to pursue litigation. He then retained the improperly obtained documents without meaningfully disclosing to the Xyngular Parties which documents he possessed for over a year. He eventually disclosed the identity and quantity of the documents in his initial disclosures, after he attached some of the documents to his pleadings and application for a temporary restraining order. The court concludes that he relied on the documents to prepare and file his claims.

The Xyngular Parties have been prejudiced in that they had no opportunity to participate in discovery of the collected documents, many of which contain sensitive and confidential business and personal information. Worse still, Schenkel contends that many of the documents are highly relevant to his claims, which further establishes that he has sought to gain an unfair advantage in this lawsuit.[304] Allowing Schenkel to maintain his claims would reward his improper conduct without sufficiently remedying his adversaries' prejudice.

Dismissal is also necessary to provide adequate punishment and deterrence. Schenkel has acted in bad faith and has continually denied doing so throughout the lawsuit. He insists that he sought the documents only to blow the whistle, though he requested and collected documents supporting his stock ownership claims, and did so after he stopped meeting with any investigative agencies. His actions contravened the judicial process and undermined the integrity of the proceedings. Endorsing Schenkel's actions would provide an incentive for future litigants to improperly gather documents from their adversaries for use in litigation while at the same time

---

[304] *See, e.g.*, *Rhodes*, 2005 WL 281221, at *5 (dismissing plaintiff's claims as a sanction because plaintiff circumvented the rules governing discovery by improperly obtaining proprietary documents belonging to her opponent before the start of litigation, the documents plaintiff obtained were relevant to her lawsuit, and defendant was prejudiced by not having an opportunity to contest the production of the documents).

invoking whistleblower protections. Whistleblowers certainly are entitled to a number of protections. But giving them far-reaching access to their litigation opponent's property swings the pendulum too far. Dismissing Schenkel's claims sends a message to litigants and whistleblowers alike that the established rules of procedure governing federal court litigation must be honored.

The court concludes that dismissing Schenkel's claims is the least severe effective sanction available to adequately cure the Xyngular Parties' prejudice, deter similar future misconduct, and punish Schenkel's wrongdoing. [305]

That said, the court declines to enter default against Schenkel on Xyngular's affirmative claims for two reasons. First, the court concludes that dismissal of Schenkel's claims is the least serious sanction available to adequately address his misconduct. In the court's judgment, additionally entering default against him on Xyngular's claims would be unduly and excessively punitive—even accounting for the seriousness of Schenkel's behavior. The court has detailed the significant harms caused by Schenkel's conduct, but that does not mean it is open season on him. Dismissal is a serious sanction, and one that courts impose cautiously and with restraint. As a result of his misconduct, the court has already deprived Schenkel of his ability to invoke the court's authority to seek redress for his claims. The court will not simultaneously deprive him of a chance to defend against Xyngular's claims.

Second, the court has yet to reach the merits of Xyngular's claims, and Schenkel has raised substantial questions about the propriety of the other founders' activities, both before and possibly during this litigation. While the court concludes that Schenkel's showing does not at this stage of the proceedings support sanctions against the Xyngular Parties, there may yet be

---

[305] *See id.* at *2 ("[L]itigants who play by their own rules 'will find that the game cannot be won.'" (quoting *United States v. Golden Elevator, Inc.*, 27 F.3d 301, 302 (7th Cir. 1994))).

implications for the Xyngular Parties' claims as this case moves forward. The court will not casually remove those issues from this lawsuit by entering default on Xyngular's substantive claims simply on the basis of Schenkel's actions.

### b. *Exclusion of Evidence*

While the court declines to enter default against Schenkel, allowing him to use the improperly obtained documents to defend against Xyngular's claims would further the prejudice to Xyngular flowing from his conduct. The court therefore excludes the improperly obtained documents with one exception: Schenkel may use any document that Xyngular chooses to rely on in support of its claims.

As it relates to Schenkel's claims, mere exclusion of the documents (without the sanction of dismissal) would not be more effective than dismissal of his claims. Schenkel used the documents to prepare and support his claims. Merely excluding the documents would allow potential litigants to circumvent the discovery process to improperly obtain evidence, use that evidence to support their claims, and then maintain those claims even if their misconduct is uncovered. Any lesser sanction than dismissal here "would be an open invitation to abuse the judicial process because litigants would infer they have everything to gain and nothing to lose by trying to lie, cheat, and abuse the orderly rules of discovery."[306]

Mere exclusion also fails to cure the prejudice to the Xyngular Parties. Schenkel has possessed the documents for over four years. He reviewed them, supplied them to his counsel, and relied upon them when seeking relief in this case. At this point, he cannot unlearn the information in the documents.[307]

---

[306] *Id.* at *5 (citation omitted) (internal quotation marks omitted).
[307] *See e.g.*, *Jackson*, 211 F.R.D. at 432 (concluding that no lesser sanction than dismissal would adequately cure the prejudice to defendant where plaintiff's "knowledge of [defendant's] proprietary information cannot be erased").

### c. Monetary Sanctions

Monetary sanctions are appropriate when the misconduct does not rise to the extreme nature that warrants dismissal and when the prejudice has been or can be mitigated through other means. For instance, the court in *Glynn v. EDO Corp.* imposed monetary sanctions instead of dismissing the case because plaintiff obtained a mere "handful of . . . documents" by improper means and there was no evidence that plaintiff "expressly requested" that defendant's current employee provide him the documents.[308] Here, however, Schenkel did not passively receive a mere handful of documents—he expressly requested, reviewed, and collected over three hundred documents over the course of a year, and then used many of the improperly obtained documents to support his affirmative claims in this litigation. A monetary sanction would not sufficiently punish or deter this misconduct. It would signal that litigants can circumvent the discovery process and still pursue their claims as long as they pay a fine.

Also, a monetary sanction would not cure the prejudice to the Xyngular Parties. Schenkel cannot unlearn the information in the documents, and the Xyngular Parties would be forced to defend Schenkel's claims despite his unfair advantage.

### d. Attorney Disqualification

A court may disqualify an attorney when his conduct gives rise to sanctions.[309] Attorney disqualification would not be as effective as dismissal here because it would not sufficiently deter or punish the misconduct. Schenkel is the offending party in this case, yet he would still be able to pursue his claims and use the improperly obtained evidence in support.

Also, attorney disqualification would not remedy the prejudice to the Xyngular Parties. Because Schenkel cannot unlearn the information in the documents, he would carry his

---

[308] 2010 WL 3294347, at *6.
[309] *See Maldonado v. New Jersey ex rel. Admin. Office of Courts-Prob. Div.*, 225 F.R.D. 120, 135–36 (D.N.J. 2004).

knowledge and misconduct into the next attorney-client relationship.[310]  The Xyngular Parties

would then have to defend Schenkel's claims while he—and possibly his new attorneys—still

possess the improperly obtained information.

Finally, given the seriousness of the sanctions imposed, the court also concludes that it

would be overly punitive to deprive Schenkel of his counsel of choice, especially if he seeks

appellate review of this Memorandum Decision and Order.  Schenkel's present counsel have

extensive knowledge of the facts giving rise to this case, the procedural history of the lawsuit

itself, and the numerous issues presented.  While the court imposes the sanctions it concludes are

warranted, those sanctions should not on the basis of his conduct separately interfere with his

ability to pursue an appeal.

### C. Attorneys' Fees and Costs

Pursuant to its inherent powers,[311] the court awards the Xyngular Parties their attorneys'

fees and costs reasonably and necessarily expended in advancing and defending the sanctions

motions.  In doing so, the court differentiates the levying of monetary sanctions (rejected above)

and the award of attorneys' fees and costs.  The levying of monetary sanctions is in effect a

punitive fine imposed on the offending party.  The award of attorneys' fees and costs remedies

the Xyngular Parties' prejudice as it relates to the fees and costs associated with the sanctions-

related proceedings.

The Xyngular Parties have spent significant time and resources advancing their motions

and defending against Schenkel's motion.  The Xyngular Parties filed their first motion for

sanctions in April 2013.  The issues raised in that motion were squarely presented for the court's

---

[310] *See Lipin v. Bender*, 644 N.E.2d 1300, 1304 (N.Y. 1994).
[311] *Beilue v. Int'l Bhd. of Teamsters, Local No. 492*, 13 F. App'x 810, 813 (10th Cir. 2001) ("When, as here, a litigant's conduct abuses the judicial process, imposition of sanctions in the form of an award of attorney fees and costs is a remedy provided for by law and within the inherent power of the court.").

resolution at that time. But the Xyngular Parties have been unable to receive a ruling on those issues until now, in part because the parties undertook additional discovery after Schenkel alleged in his opposition brief that the Xyngular Parties also engaged in pervasive misconduct. The Xyngular Parties have now proved by clear and convincing evidence that Schenkel engaged in bad faith misconduct warranting dispositive sanctions, while Schenkel has failed to prove at this stage that the Xyngular Parties committed sanctionable misconduct. The Xyngular Parties were prejudiced by having to participate in additional discovery due to Schenkel's accusations, by having to defend against Schenkel's meritless motion, and by having to bring two motions of their own to prevent Schenkel from carrying on with an unfair advantage garnered by his misconduct. The court exercises its inherent powers to award reasonable and necessary attorneys' fees and costs to the Xyngular Parties.

### D.  Summary

Federal courts are forums for adverse parties to resolve disputes. The fair resolution of those disputes depends on the parties' compliance with the rules and standards that govern litigation. These rules and standards—derived from the Federal Rules of Civil Procedure, the court's inherent powers, and the standards of professional conduct—aim to make federal court litigation just, efficient, and ethical. They form a structured process designed to uncover the truth. And when a party fails to comply with these basic rules and standards, it is within the court's power to impose sanctions against the offending party.

Here, Schenkel circumvented the rules and standards governing discovery when he surreptitiously requested, reviewed, and obtained documents belonging to the Xyngular Parties and other entities with an eye toward litigation, and then used those documents as evidence once litigation began to support his claims and gain an unfair advantage. This is the sort of bad faith

misconduct that the court has the power—and obligation—to sanction in order to preserve the integrity of these proceedings and engender the public's trust in the judicial process. Allowing Schenkel's misconduct to go unpunished would injure the judicial system and provide future litigants with an incentive to raid their potential opponents' file cabinets before litigation to achieve an end-run around the rules governing the just resolution of disputes. Schenkel has committed serious sanctionable misconduct.

When evaluating what sanction to impose against a party who has engaged in bad faith misconduct, courts are advised to impose the least severe sanction that will punish the offending party for his wrongdoing, remedy the prejudice to and harm suffered by the adverse party and the judicial process, deter future litigants from engaging in similar conduct, and inspire confidence in the integrity of the judicial process. After examining the efficacy of lesser sanctions, the court concludes that dismissing Schenkel's claims is the least severe yet effective sanction to achieve those goals.

The Xyngular Parties have been prejudiced by not being able to meaningfully participate in the discovery process and argue against the production of certain documents. Some of the documents appear wholly irrelevant to this lawsuit—showing that Schenkel would not have obtained them if he sought them through proper discovery channels—while others seem entirely relevant to this lawsuit—showing that Schenkel sought to gain an unfair advantage in this case. Schenkel's misconduct has also undermined the court's ability to resolve discovery disputes that might arise. Anything short of dismissal will fail to remove the taint that Schenkel has caused and fail to adequately deter future litigants from engaging in this type of self-help discovery. And allowing Schenkel to pursue his claims would send a message to other litigants that they have much to gain and little to lose by taking their potential opponents' property using improper

means in anticipation of litigation. Although the court concludes that dismissal is the most appropriate sanction, the court concludes that entering default against Schenkel on Xyngular's affirmative claims is unnecessary and would be excessively punitive.

The Xyngular Parties' Motion is GRANTED IN PART.

## CONCLUSION

The court GRANTS IN PART the Xyngular Parties' Motion for Sanctions (Dkt. 290) and DENIES WITHOUT PREJUDICE Schenkel's Motion for Sanctions (Dkt. 289).

Schenkel's counter- and third-party claims are dismissed with prejudice. The Third-Party Defendants are dismissed. The court also excludes the improperly obtained documents. Schenkel may not affirmatively use the improperly obtained documents in defense of Xyngular's claims. Insofar as the Xyngular Parties choose to use an improperly obtained document, Schenkel may likewise use the document. Lastly, the court awards the Xyngular Parties fees and costs reasonably and necessarily incurred in advance or in defense of these motions.

SO ORDERED this 2nd day of August, 2016.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge